441 F.2d 704
 (Consolidated Helium Cases)
NORTHERN NATURAL GAS COMPANY et al. (Helex Group), Appellees
and Cross- Appellants,
v.
Ralph GROUNDS, Henry Hitch, et al. (Landowners), Appellants
and Cross- Appellees, and Socony Mobil Oil Co., Inc. (Mobil
Oil Corporation substituted) et al. (Lessee-Producers),
Appellants and Cross-Appellees.*
Nos. 307-69 to 322-69, 361-69 to 402-69 and 486-69 to 515-69.
 United States Court of Appeals,
Tenth Circuit.
 March 2, 1971.
Rehearings Denied May 20, 1971 and June 9, 1971.
 
 Wayne Coulson and Dale M. Stuckey, Wichita, Kan., for landowners. With them on the brief were Bernard E. Nordling, Leland E. Nordling, Hugoton, Kan., Gene Stipe, Richard L. Gossett, McAlester, Okl., Leo Winters, Hooker, Okl., and W. A. McWilliams, Oklahoma City, Okl., for landowners; Donald I. Mitchell, Wichita, Kan., for Federal Land Bank; and of counsel were Kramer, Nordling & Nordling, Hugoton, Kan., Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., and Stipe, Gossett & Stipe, Oklahoma City, Okl.
 Richard Jones, Wichita, Kan., James B. Diggs, Oklahoma City, Okl., Gerald Sawatzky and George C. Spradling, Wichita, Kan., for lessee-producers. With them on the brief were Arloe W. Mayne, G. Fred Charles, Ashland, Ky., J. M. O'Loughlin, Oklahoma City, Okl., and Stanley G. Andeel, Witchita, Kan., for Ashland Oil & Refining Co.; William C. Charlton, Abilene, Tex., and Stanley G. Andeel, Wichita, kan., for Cabot Corp.; Cecil C. Cammack, Alfred O. Holl, Roy Z. Johnson, R. O. Mason, Bartlesville, Okl., and Stanford J. Smith, Wichita, Kan., for Cities Service Oil Co.; Stanley G. Andeel, Wichita, Kan., for Dorchester Gas Producing Co.; William F. Pielsticker, Wichita, Kan., for Gulf Oil Corp.; William R. Horkey, Leon C. Gavras, Tulsa, Okl., and Stanley G. Andeel, Wichita, Kan., for Helmerich & Payne, Inc.; Charles B. Wallace, Donald G. Canuteson and William H. Tabb, Dallas, Tex., for Mobil Oil Corp.; H. O. Hickman and R. H. Landt, Ft. Worth, Tex., for Pan American Petroleum Corp.; H. A. Berry, W. M. Sutton, W. E. Notestine, Amarillo, Tex., and George B. Collins, Wichita, Kan., for Diamond Shamrock Corp.; Murray Christian and R. T. Robberson, Houston, Tex., for The Superior Oil Co.; Eugene G. Bell, Tulsa, Okl., for Mapco Production Co.; Philip R. Wimbish, Elmer W. Adams, Tulsa, Okl., and Stanley G. Andeel, Wichita, Kan., for Texaco, Inc.; and of counsel were Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for Ashland Oil & Refining Co., Cabot Corp., Dorchester Gas Producing Co., Helmerich & Payne, Inc., and Texaco, Inc., Hershberger, Patterson, Jones & Thompson, Wichita, Kan., for Mapco Production Co., Mobil Oil Corp., and The Superior Oil Co., Holliman, Mason & Maddux, Bartlesville, Okl., for Cities Service Oil Co., Lilleston, Spradling, Gott, Stallwitz & Hope, Wichita, Kan., for Pan American Petroleum Corp., and Underwood, Wilson, Sutton, Heare & Berry, Amarillo, Tex., for The Diamond-Shamrock Corp.
 Emmet A. Blaes, Wichita, Kan., Richard B. McDermott, Tulsa, Okl., William S. Richardson, Kansas City, Mo., and Mark H. Adams, II, Wichita, Kan., for the Helex group. With them on the brief were Jack W. Wertz, George E. Peabody, Oklahoma City, Okl., and Mark H. Adams of Adams, Jones, Robinson & Manka, Wichita, Kan., for Cities Service Gas Co.; Mark H. Adams of Adams, Jones, Robinson & Manka, for Cities Service Cryogenics, Inc. and Cities Service Helex, Inc.; William J. Zeman, Lloyd G. Minter, Kenneth Heady, Bartlesville, Okl., and Boesche, McCermott & Eskridge, Tulsa, Okl., for Phillips Petroleum Co.; Jochems, Sargent & Blaes, Wichita, Kan., Wendell J. Doggett, Kansas City, Mo., and William L. Robertsin, Indianapolis, Ind., for National Helium Corp. and Panhandle Eastern Pipe Line Co.; F. Vinson Roach, Patrick J. McCarthy, Omaha, Neb., and Mark H. Adams of Adams, Jones, Robinson & Manka, Wichita, Kan., for Northern Natural Gas Co., Northern Helex Co., and Northern Gas Products Co.
 Floyd L. France, Washington, D.C., for the United States. With him on the brief were Shiro Kashiwa, Asst. Atty. Gen., Bernard V. Borst, Asst. U.S. Atty., and S. Billingsley Hill, Atty., Dept. of Justice.
 Before BREITENSTEIN, SETH and McWILLIAMS, Circuit Judges.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 Helium, a rare element found as a component of natural gas, has become in the last 20 years increasingly important to national defense, science and industry. Through scientific and technical advances this inert and noncombustible gas, which was formerly wasted at the burner tips of gas appliances, now has great value. Congress recognized the need for helium by the Helium Act Amendments of 1960, Pub.L. 86-777, 74 Stat. 918, 50 U.S.C. 167 et seq., which provide for a helium conservation program, with private participation, under the control of the Bureau of Mines, an agency of the Department of the Interior.
 
 
 2
 The natural gas fields of the Hugoton area in Western Kansas and the Oklahoma and Texas panhandles contain 99% Of the nation's recoverable supply of helium. The landowners gave the leases under which the helium-bearing gas is obtained from the earth. The lessee-producers drilled the wells, produced the gas, and sold it to interstate pipelines which are under the jurisdiction of the Federal Power Commission. Affiliates and subsidiaries of the pipelines, the Helex group, separate helium from other gaseous components and sell the mixture to the United States. The Bureau of Mines stores the helium mixture and refines it to 99.99% Pure helium for sale to government agencies and private industry. The basic issue is whether the landowners and the lessee-producers can receive benefit from the value of the helium. The trial court rejected all claims of the landowners and lessee-producers to the helium and gave judgment for the Helex group and the United States. See Northern Natural Gas Company v. Grounds, D.Kan., 292 F.Supp. 619. We reverse. In our opinion the Helex companies must account to the lessee-producers for the reasonable value of the helium contained in the processed gas and the lessee-producers must pay royalty on such value to the landowners.
 
 
 3
 Six of the eight actions which were consolidated for trial are in the nature of interpleader. The fund in each suit is the money paid and to be paid by the United States to the interpleading plaintiffs for the helium-gas mixture produced and sold by them. Four of the cases were brought by Cities Service Gas Company, a pipeline. One was brought by Northern Natural Gas Company, a pipeline, and its subsidiary Northern Helex Company. In each of these five cases the defendants are named landowners and named lessee-producers in each instance as representatives of a class. The sixth interpleader was brought by National Helium Corporation which is owned in equal shares by Panhandle Eastern Pipe Line Company and National Chemical and Distillers Company. The defendants are Panhandle Eastern and named landowners as representatives of a class. Pursuant to a third-party complaint by Panhandle Eastern, named lessee-producers were brought in as representatives of a class. Motions to dismiss the interpleaders on jurisdictional grounds were denied by the trial court and we affirmed. Grounds v. Northern Natural Gas Company, 10 Cir., 327 F.2d 1003.
 
 
 4
 The remaining two actions were brought by named landowners, as representatives of their class, against the United States. One is under the Federal Tort Claims Act, see 28 U.S.C. 1346(b), 1402, and 2674, on the theory of conversion, and the other under the Tucker Act, see 28 U.S.C. 1346(a)(2), on the theory of reverse condemnation.
 
 
 5
 All eight actions were maintained in the district court as class actions under Rule 23, F.R.Civ.P. One class is the landowners and the other is the lessee-producers. The district court held that the actions were properly maintainable as class actions. See 292 F.Supp. 619, 633-637. On these appeals no question is raised as to the propriety of the district court treatment of the cases as class actions.
 
 
 6
 After consolidation, there were extensive discovery proceedings, a definitive pre-trial order, and a 43-day trial limited to the question of liability. The trial court made full and detailed findings of fact which are found at 292 F.Supp. 619. For the sake of brevity in this opinion, we repeat only those facts which we deem necessary for understanding of the case and disposition of the issues. It is enough to say that we find no material dispute as to the determinative facts. The controversy is over the conclusions to be drawn from those facts and the application of the law thereto.
 
 
 7
 Helium is a colorless, odorless, and tasteless gas which, in the present state of scientific knowledge, will not react chemically or physically with any other element, except under laboratory conditions. The generally accepted theory is that helium is formed by radioactive disintegration within the earth and migrates to the same reservoir traps as do other gases. Through eons of time it has commingled with, and become diffused with, natural gas hydrocarbons which were formed from organic materials of ages past. Helium is noncombustible. It is the second lightest element found on earth, next to hydrogen which is highly combustible. Helium does not liquefy at standard atmospheric pressure until it reaches -452.1 degrees Fahrenheit, almost absolute zero and lower than any other gas.
 
 
 8
 Helium was first discovered in the spectrum of sunlight in 1868. Sometime in the 1890's helium was found on the earth. In 1905, helium was discovered in gas from a well at Dexter, Kansas. Helium remained a laboratory curiosity until 1918 when the United States began commercial extraction of helium from gas produced in the Petrolia Field of Texas for use in military balloons and blimps during World War I.[1]
 
 
 9
 Before 1960, with minor exceptions, the production and marketing of helium was accomplished by the Bureau of Mines pursuant to the Helium Act of 1925, 43 Stat. 1110. Until the advent of World War II, the uses of helium outside of the laboratory were in lighter-than-air craft and, when mixed with oxygen, in medicine and deep-sea diving. During this period, the United States by purchase and condemnation obtained various rights under which it produced helium at government plants. The 1937 amendments, 50 Stat. 885, to the Helium Act of 1925, directed the Secretary of the Interior to purchase if possible all private helium plants. Under this authority the United States acquired two plants of the Girdler Corporation, the only private helium extraction operation in the country at that time.
 
 
 10
 During World War II the government constructed four plants to meet the greatly increased military need for helium. After the war all of the plants except one were shut doen. In the 1950's the demand for helium rose spectacularly. This came from a combination of new uses, including atomic weapons, nuclear energy plants, military and civilian rocketry, exploration of outer space, the field of cryogenics, welding of newly used metals, breathing mixtures for medical patients, divers and astronauts, and other uses connected with both science and industry. Because of the limited supply and the wasting of the known reserves, the government set up a Helium Policy Working Group under the chairmanship of Under Secretary of the Interior Chilson. The group recommended a program which envisaged participation by private industry. The 1960 amendments to the Helium Act were the result of these activities.
 
 
 11
 The record shows that, although helium is contained in either measurable or detectable quantities in gas found in a majority of natural gas fields in the United States, 99% Of the nation's helium resources are in the natural gas reserves of the Hugoton area. 292 F.Supp. at 654. This area is approximately 210 miles from north to south, and 160 miles from east to west. It covers approximately 33,000 square miles and over 21 million acres. Underlying the area are about 15% Of the known natural gas reserves of the United States. According to some of the testimony, it is the largest single, pressure-connected gas reservoir in the world. The helium content averages between .4% And .5% In volume. The economically recoverable helium is estimated at 119 billion cubic feet from estimated resources of a total of 36.4 trillion cubic feet of gas.
 
 
 12
 The components of natural gas produced in the Hugoton area are about 85% Hydrocarbons ranging from methane, the compound lightest in molecular weight but lowest in Btu (British Thermal Unit, a measure of heat) yield per unit of volume, through ethane and propane up to various heavier hydrocarbons. The remaining 15% Is composed of non-hydrocarbon constituents including nitrogen, oxygen, argon, helium, hydrogen sulfide, hydrogen, and carbon dioxide. The composition of gas from separate wells is not constant. For example, methane runs from a low of 45.9% To a high of 82.6%, nitrogen from 6.5% To 44.3%, and helium from .22% To .97%.
 
 
 13
 The production of natural gas from underground reservoirs in accomplished by reservoir pressure, specifically the difference between the greater reservoir and lesser wellhead pressure causes the gas to flow through the well bore. The output of gas is produced in its entirety with all of its constituents randomly commingled. The separation of helium at the wellhead is not economically feasible.
 
 
 14
 The first gas well in the Hugoton area was completed in Texas in 1918 and was followed by Kansas and Oklahoma wells in 1922. Development of the fields in terms of completed wells was slow until the late 1920's and early 1930's when the extension of pipelines into the area made it accessible to commercial markets. The productive geographical limits expanded gradually and were finally defined in the 1940's. The record shows that prior to 1954 there were 8,504 wells drilled in the area and an addition 1,538 wells in the period 1954-1959.
 
 
 15
 The gas is produced under leases given by the owners of the appropriate mineral rights. The trial court said that 65% Of the leases were taken by lease brokers rather than by representatives of the producing industry. There are thousands of leases and a great variety of lease forms. The leases were either assigned to, or taken by, the companies within the lessee-producer group for development, production, and marketing. The lessee-producers sell the gas to pipeline companies which transport it interstate for resale. The gas is commonly delivered at the wellhead but occasionally at a gathering point and the volume is measured when delivered. The price is stated in terms of cents per Mcf, thousand cubic feet, and is commonly subject to quality adjustments depending on Btu content. Ordinarily, the sales by the lessee-producers are under long-term executory contracts containing price escalation, arbitration, or renegotiation clauses.
 
 
 16
 The question of title to helium arose during the contract negotiations between the Helex companies and the Bureau of Mines.[2] The Helex companies agreed to warrant title and to indemnify the United States for all ownership claims of third parties. The ultimate cost each seller might have to bear because of title failure is limited by various contract provisions which were thus summarized by the trial court, 292 F.Supp. at 658:
 
 
 17
 'The ultimate cost each seller (Helex company) might have to bear as a result of failure of title is limited, however, by provisions that the seller be reimbursed by the United States for all payments made in satisfaction or settlement of ownership claims to helium, to the extent that such payments exceed approximately $3.00 per Mcf of helium.'
 
 
 18
 With this background we turn to the contentions of the parties. Other pertinent facts will be developed in the discussion of specific issues.
 
 
 19
 1. Landowners' Claims.
 
 
 20
 The landowners contend that the leases cover only combustible oil and gas. The trial court held that the grant of gas in each lease 'extends to the entire gas stream which emerges at the wellhead absent an express reservation of any constituent products, and that helium passes thereunder unless expressly reserved.'
 
 
 21
 There are estimated to be approximately 30,000 persons who receive income from the production of helium-bearing natural gas by virtue of ownership of land, mineral interest, royalty, or other interests. Thousands of leases executed on more than 150 printed forms cover the Hugoton gas. Over 75% Of the leases were executed after 1940. Leases held by named lessee-producers have at least 50 different granting clauses. Six of these clauses are found in leases covering over 90% Of the acreage. These were summarized thus by the trial court, 292 F.Supp. at 660:
 
 KANSAS AND OKLAHOMA LEASES
 
 22
 Percentage
 of Acreage
 ----------
"oil and gas, casinghead gas and
 casinghead gasoline" 69.688
"oil, gas, casinghead gas, casinghead
 gasoline and all other gases and their
 respective constituent vapors" 10.132
"oil and gas" 7.144
"oil, distillate, gas, casinghead gas,
 casinghead gasoline and all other gases
 and their respective constituent vapors" 3.311
 ----------
 90.275
 TEXAS LEASES
"oil and gas" 39.860
"oil, gas and all other minerals" 25.517
"oil and gas, casinghead gas and
 casinghead gasoline" 14.545
"oil, gas, and all other minerals" 14.168
 ----------
 94.090
 
 
 23
 Leases covering 99.99% Of the acreage contain the words 'oil' and 'gas.' Of the many different granting clauses the landowners regard only five as conveying helium as part of the gas. In these instances the language specifically covers all gaseous substances without regard to their similarity or dissimilarity to 'gas' as used in the phrase 'oil and gas.' The most commonly used lease form grants 'oil and gas, casinghead gas and casinghead gasoline.'[3]
 
 
 24
 By statute in each of the three states a conveyance of real estate passes the entire estate of the grantor unl §§ an intent to pass a lesser estate expressly appears or is necessarily implied. K.S.A. 58-2202,16 O.S.A. 29; Vernon's Ann.Rev.Civ.Stat. of the State of Texas, art. 1291. In Kansas and Oklahoma an oil and gas lease is a license, incorporeal hereditament, or profit a prendre. See Summers, The Law of Oil and Gas 161, 164 (1954) and the cases there cited. In Texas an oil and gas lease conveys a fee simple determinable and is a 'present conveyance of * * * the entire title to the designated minerals existing in the land.' Andrews v. Brown, Tex.Civ.App., 283 S.W. 288, 291. For our purposes we see no difference in result whether the leases are considered as licenses or conveyances.
 
 
 25
 Our first problem is with the word gas. The trial court said that "gas' or 'gases' are used interchangeably to describe any naturally-formed aeriform substances indigenous to the underlying reservoir, which aeriform substances include helium. * * *' See 292 F.Supp. at 686. The learned dissertations of the parties on the derivation and use of the word gas during the last several hundred years is interesting but not conclusive. Gas is a generic term which is defined in Webster's Third New International Dictionary (G. & C. Merriam Co., 1961) as
 
 
 26
 '1. A fluid (as air) that has neither independent shape nor volume but tends to expand indefinitely; a substance at a temperature above its critical temperature and therefore not liquefiable by pressure alone. * * *'
 
 
 27
 As we see the problem, gas has two meanings, one in the physicist's sense conforming to the Webster definition and the other in the vernacular sense with the meaning dependent on the use of the word. The landowners point out that in the leases the word oil and the word gas are used in conjunction. They contend that the terms 'oil' and 'gas' taken together are used interchangeably with the term 'petroleum.' Accordingly, they say, gas must refer to a gaseous hydrocarbon. This is a non sequitur. It is an attempt either to rewrite the leases or to convert a claimed vernacular use into a subjective intent. Nothing in the record shows that 'oil and gas' or 'petroleum' come from the earth as a pure hydrocarbon. The record does show that Hugoton gas contains noncombustible components. We doubt whether it is possible to produce either oil or gas without at the same time producing some impurities.
 
 
 28
 The landowners' attempt to bolster their position by reliance on ejusdem generis is not persuasive. Ejusdem generis is a tool to be used in search for the correct meaning of words. Ordinarily it limits general terms which follow specific ones to matters similar to those specified. Gooch v. United States, 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522. The landowners say that the word oil is specific and limits the meaning of gas. We believe that the word oil and the word gas have equal status. Navajo Tribe of Indians v. United States, 364 F.2d 320, 325, 327, 176 Ct.Cl. 502, to which reference will be made later, rejected the application of ejusdem generis in the construction of a lease of 'all the oil and gas deposits.' We agree.
 
 
 29
 The landowners say that the word gas is ambiguous. The argument seems to run like this. Gas has a physicist's meaning to describe a state of matter and a popular, or industry meaning, to cover a mixture of gaseous hydrocarbons. This brings us to the field of semantics. We agree that the meaning of a statement often requires a knowledge of its connotation and that the objective meaning of a word cannot be considered, ordinarily, separate and apart from the context of its actual subjective use. The argument goes that the landowners subjectively intended to grant combustible oil and gas and nothing else. All this does is to lead us to the question of intent which we shall discuss later. In our opinion there is no ambiguity which calls into play the rule that oil and gas leases, when ambiguous, are construed against the lessees and in favor of the lessors. See e.g. Beatty v. Baxter, 208 Oki. 686, 258 P.2d 626.
 
 
 30
 Few decisions have any bearing on the specific issue. In Gilmore v. Superior Oil Co., 192 Kan. 388, 388 P.2d 602, the court was concerned with the deduction of compression expenses from gas royalties. In holding that a lessee could not withhold royalties in order to charge lessors with compression costs, the court commented that if a lessee desires complete coverage 'of oil, gas, liquid hydrocarbons, or even helium gas * * * the lessee has the opportunity to protect itself by the manner in which it draws the lease.' Ibid at 605. Relying on Curtis Publishing Co. v. Cassel, 10 Cir., 302 F.2d 132, 135, and like cases, the landowners say that this is a clear and unequivocal statement that an oil and gas lease not mentioning helium does not cover it and, so far as Kansas is concerned, is binding on federal courts. We are not convinced. Gilmore was concerned with duty to market, not with lease coverage. The statement is not considered dictum but is 'comment merely obiter,' see Hawks v. Hamill, 288 U.S. 52, 59, 53 S.Ct. 240, 77 L.Ed. 610, and is neither conclusive nor particularly persuasive.
 
 
 31
 The landowners emphasize the Oklahoma casinghead gas cases. Casinghead gas is nothing more than gas from an oil well. Mussellem v. Magnolia Petroleum Co., 107 Okl. 183, 231 P. 526, 530. The evidence shows that casinghead gas is composed of the lighter members of the paraffin series, largely methane with some ethane and propane. Casinghead gasoline is composed of heavier elements of the same series.
 
 
 32
 Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 501, held that a contract for royalty on oil did not entitle the holder to royalty on gasoline manufactured from casinghead gas. Hammett and the cases which followed it are summarized in Broswood Oil Co. v. Sand Springs Home, 178 Okl. 550, 62 P.2d 1004, 1006, which states the effect of the Oklahoma rule to be that, absent a contrary intent of the parties, a reservation of royalty on oil and on gas 'means oil in its ordinary acceptation and gas from a gas well as the same is ordinarily understood. * * *' The rule established in Hammett and its progeny has been subjent to considerable criticism. Ibid. There appears to be some uncertainty in the Oklahoma cases concerned with the problem of whether casinghead gas is within a lease which covers both oil and gas.
 
 
 33
 For whatever the Oklahoma casinghead gas decisions may be worth and regardless of whether they are sound law, we believe that they are not applicable here. When the lease, or other agreement, provides for royalty on oil from an oil well and on gas from a gas well and casinghead gas is produced from an oil well, the recovery of royalty depends on whether gas emerging from an oil well is commonly understood to be oil. In the Jugoton area, helium emerges as a component of the gas produced from a gas well. It necessarily comes from the wellhead and into the transmission line with all the gases which make up the entire stream. Casinghead gas from an oil well is only incidental to the production of oil and may be separated at the wellhead.
 
 
 34
 The situation in Texas is different. Lone Star Gas Co. v. Stine, Tex.Com.App., 41 S.W.2d 48, was concerned with a deed covering 'all natural gas.' The question was whether natural gasoline was covered by the grant. The court held that it was and said that natural gas meant all the constituent elements composing the gas and that the grantee had the right to sell the gas in the form in which it emerged from the earth or to split it into its constituent elements and sell them. Taken literally, this language is broad enough to embrace helium in a grant of gas. The reasoning of the court, however, will not apply to helium. The court compared oil, gas, casinghead gas, and coal, and drew the premise that but for their distinction in natural form, these substances possess somewhat similar chemical properties and are readily convertible into gaseous hydrocarbons by artificial means. Helium is not a hydrocarbon and is not convertible into one.
 
 
 35
 The decision closest to our problem is Navajo Tribe of Indians v. United States, 364 F.2d 320, 324-327, 176 Ct.Cl. 502. The Tribe claimed that a 1923 lease 'of all the oil and gas deposits' referred to gaseous hydrocarbons and not to helium. In the 1940's helium-bearing gas was produced and the Tribe was paid royalties. The Court of Claims found the Oklahoma casinghead gas cases unpersuasive and followed Lone Star. It said that although the parties may have been thinking of fuel-type gases, it was more realistic to presume that 'the grant included not only hydrocarbons but the other gaseous elements as well.' Our principal difficulty with Navajo is that it treats the problem of whether the word gas includes helium as one of law. This may have been proper when dealing with tribal lands without regard to any state law impediment. We believe that this question is one of fact and of the conclusions which are to be drawn from the facts.
 
 
 36
 The only other helium case is Hoff v. Girdler Corp., 104 Colo. 56, 88 P.2d 100. We fail to see the relevance of that decision. The issue was whether the lessee had abandoned the lease. The question whether a grant of gas included helium was not raised.
 
 
 37
 In Hans v. Great Bend Brick & Tile Co., 172 Kan. 478, 241 P.2d 475, 478, the court said that a conveyance of all the 'oil, gas and other minerals' did not include clay. Oklahoma has held that a reservation of 'oil, petroleum, gas, coal, asphalt and all the other minerals of every kind and character' was not a reservation of underground water. See Mack Oil Co. v. Laurence, Okl., 389 P.2d 955, 961. A similar result was reached in Texas by Fleming Foundation v. Texaco, Inc., Tex.Civ.App., 337 S.W.2d 846, 852, which held that subsurface water was not within a grant of oil, gas and other minerals.
 
 
 38
 We believe that it is a fair interpretation of the cases just cited to say that in the three states intent is a question of fact. A plethora of evidence was received on the point. The landowners rely on the meaning of gas in both common and industrial usage. They presented a lexicographer who made a study of dictionaries, encyclopedias, area newspapers and selected magazine articles and stated his opinion that the word gas did not connote helium to the average landowner of the Hugoton area. Their opponents counter with an account of the helium development in the period from 1917 to World War II and emphasize that in federal oil and gas leases made after 1920 the United States expressly preserved helium. A recitation of all of the evidence would serve no good purpose. The trial court found that gas did not connote helium to the average landowner, that no landowner specifically contemplated helium in granting rights to produce gas, and that other evidence establishes 'that he had no intention whatever respecting it.' 292 F.Supp. at 664. Such findings are supported by substantial evidence and we must accept them.
 
 
 39
 The landowners say further that the value of natural gas lies in its use as fuel, that helium is valueless as a part of a fuel stream, and that the average landowner could not have intended to convey helium for fuel purposes. The Helex companies, although conceding that the principal use of natural gas has been for fuel, point out that it has other uses of economic value such as a feed stock for petro-chemical operations, the manufacture of carbon black, and as a pressuring agent in oil production. Six witnesses who had either taken leases or supervised such activities testified that to their knowledge no land man or lease negotiator had ever discussed the gas to be leased in terms of its constituents. The only lease making specific provision for helium was executed after the start of this litigation. The trial court said that this phase of the argument 'is but an attempt to convert an uninformed popular notion respecting the commercial uses of natural gas into an intention by the lessor to convey only those discrete constituents of the gas stream, the uses of which conformed to that notion.' 292 F.Supp. at 665.
 
 
 40
 The trial court concluded its treatment of this part of the case by saying that, in view of the circumstances of lease execution, the definition and usage of terms within the industry, and the intentions of the parties as disclosed by their actions, the leases extend to the entire gas stream absent an express reservation, and helium passes thereunder unless expressly reserved. 292 F.Supp. at 669. The landowners contend that this conclusion is inconsistent with the finding that the average landowner had no intent with regard to helium.
 
 
 41
 We believe that the issue is whether general or specific intent controls. The claimed general intent is lease coverage of all components of the gas produced by the wells. The specific intent is said to be lease coverage only of combustible gas. General intent includes helium and specific intent excludes it.
 
 
 42
 Nothing in the leases shows an intent to convey only combustible gas. If that is what the lessors meant, they should have said so. The evidence of the landowners is that they knew nothing of helium. If that is true, they could not have had any intent with regard to it. Reliance on specific intent is not compatible with denial of any intent. We believe that the search should be for general intent rather than for a supposed, but unexpressed, specific intent. General intent should be discovered not by defining and redefining the terms used but by considering the purposes of the grant in terms of enjoyment of the rights created. See Comment. New Values Under Old Oil and Gas Leases: Helium Who Owns It? 62 Mich.L.Rev. 1158, 1169.
 
 
 43
 The landowners desired to profit by the production of gas from their lands. To attain this end they gave exclusive leases permitting exploration, development, production and marketing. The lessees drilled the wells and found gas. The gas came from the ground with all of its components and was measured at the well head. The gas was produced as a whole without separation of any of the components. Wellhead separation of helium was impractical.
 
 
 44
 In Utilities Production Corporation v. Carter Oil Co., 10 Cir., 72 F.2d 655, 659, a case concerning the right of an oil lessee to use residue gas for repressurization, we said that the argument that lease parties contemplated the use of gas 'for such methods of operation and development as were known to the industry the day the leases were signed * * *' was specious, and that a 'foresighted intent cannot be imputed to the parties, for they knew that improvements would come about during the terms of the leases, and must have contemplated the use of such improved methods.' We believe that those principles apply here. It is true that we are dealing with a new use of a component of the gas rather than an improved method of production but we are aware of no reason why the result should be different.
 
 
 45
 In the final analysis, the effort of the landowners is to write into the leases an exception or reservation which is not found in the executed instruments. They seek to except from the leases the helium which they cannot produce themselves. The only way to obtain value for the helium is to produce it, together with all other components of the gas, and run the gas through a separator. We will not import into the grants of oil and gas a subjective intent to convey only those components of the gas which comport to a subjective notion of the commercial end uses at the time of lease execution.
 
 
 46
 In our opinion general intent is closer to original intent than is specific intent which blossoms when a component previously regarded as an impurity becomes valuable. The discovery of the use and value of a component does not expand the grant but the expansion of that discovery into tangible value makes more certain the specific object of the general grant. We conclude that, absent specific reservations, the grant of gas by the leases covered all components of the gas, including helium.
 
 
 47
 In the interpleader actions the landowners have asserted alternative in personam cross-claims against the producers based on abandonment and an alleged breach of the covenant to market. The lessee-producers say that the court does not have jurisdiction of such claims, that abandonment is not present because neither intentional nor voluntary relinquishment of the leases has been shown, and that no breach of the covenant has occurred because after the market developed in 1962 they diligently pursued their rights to payment for the helium content. Interpleader jurisdiction is limited to the fund in controversy. Here the fund is the money paid and to be paid to the interpleading plaintiffs for the helium-gas mixture produced and sold by them. The cross-claims have no relation to that fund. Hence, jurisdiction is not established. See State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 533-537, 87 S.Ct. 1199, 18 L.Ed.2d 270, and Knoll v. Socony Mobile Oil Co., 10 Cir., 369 F.2d 425, 429, cert. denied 386 U.S. 977, 87 S.Ct. 1173, 18 L.Ed.2d 138.
 
 
 48
 The Tort Claims case, based on conversion, and the Tucker Act case, based on reverse condemnation, are each dependent on the theory that the landowners have not parted with title to the helium. Our holding that the leases grant the helium removes the essential basis for each case and requires affirmance of the district court's dismissal of each.
 
 
 49
 2. Lessee-producers' Claims.
 
 
 50
 The lessee-producers have drilled the wells, produced the gas, and sold it to interstate pipelines whose Helex subsidiaries separate helium from many other components and deliver the resulting mixture to the Bureau of Mines for further refinement. The named lesseeproducers represent a class of well over 500 oil and gas operators. The lesseeproducers say that they are entitled to recover out of the interpleaded funds the reasonable value of the commingled helium. They concede that they must pay royalty to the landowners on any amounts so received. The trial court held that the Helex companies have no liability to the lessee-producers.
 
 
 51
 The parties stipulated that heliumbearing natural gas delivered to the Helex companies is gas purchased and transmitted for resale in interstate commerce, that all gas purchase contracts between the lessee-producers and the pipelines are filed with the Federal Power Commission (FPC) as rate schedules under the Natural Gas Act, and that all payments made by the pipelines to the lessee-producers are at rates established, or permitted to be paid, by FPC.
 
 
 52
 The Natural Gas Act of 1938, 52 Stat. 821-833, 15 U.S.C. 717-717w, placed the pipelines under FPC jurisdiction. In 1954 by its decision in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, the Supreme Court held that independent producers[4] are natural gas companies within the meaning of the Natural Gas Act and subject to FPC jurisdiction. The lesseeproducers are independent producers.
 
 
 53
 The Natural Gas Act provides that all rates and charges of natural gas companies 'shall be just and reasonable.' See 15 U.S.C. 717c(a). After the Phillips decision, FPC required independent producers to file their contracts with the pipelines and the contract price was accepted subject to FPC review.
 
 
 54
 The 1960 Helium Act Amendments authorized the Secretary of the Interior to make long-term contracts, not exceeding twenty-five years, for the acquisition, processing, transportation, and conservation of helium. The Bureau of Mines negotiated with pipelines controlling large volumes of helium-bearing gas. In 1961, contracts were made with Northern, Cities Service, and National, all of which are interpleader plaintiffs. Another contract later that year was made with Phillips Petroleum Company which is not an interpleader plaintiff but which was joined by the government as a thirdparty defendant in the landowners' Tort Claims and Tucker Act suits. Phillips was also brought in as a lessee-producer in two interpleaders but disclaimed any interest in the fund. See 292 F.Supp. 629, 631-632. The Cities Service, Northern, and National extraction plants are all in Kansas. The Phillips plants are in Texas.
 
 
 55
 The contracts call for the construction of plants requiring capital investments of millions of dollars. The separation of helium from natural gas is accomplished by an expensive and complicated process whereby the gas is put under high pressure and is cooled to extreme temperatures. The other constituents of the gas liquefy and separate, leaving the helium and smaller quantities of other constituents as the remaining gas. The crude helium-gas mixture is defined in the contracts as 'the gaseous product resulting from the helium extraction process * * * (and) comprised of helium predominately together with other constituents of the natural gas.' In actual operations the delivered gas mixture is about 70% Helium and 30% Nitrogen. The gas mixture is transmitted by a government pipeline to the Cliffside, Texas, underground storage reservoir. When needed it is withdrawn and refined prior to sale to about 99.99% Purity.
 
 
 56
 The contract prices apply only to volumes of contained helium. The initial prices, all subject to escalation, are $11.24 per Mcf for Northern Helex, $11.74 for Cities Service Helex, $11.78 for National Helium, and $10.30 for Phillips Petroleum. Under each contract the United States is obligated to purchase the total helium production for 22 years limited to stated annual dollar maximum amounts which are $9,500,000 in the Northern Helex contract, $9,100,000 in the Cities Service contract, $15,200,000 in the National Helium contract, and $13,700,000 in the Phillips contract. The refined helium is sold to both federal and nonfederal users at $35 per Mcf, a price set by the Secretary of the Interior pursuant to the 1960 amendments.
 
 
 57
 The trial below was restricted to the issue of liability and no determination was made of the value of the helium-bearing gas. The court did point out that in the 1958 contract between the government and Colorado Interstate Gas Company for the Keyes plant 'the contract requires that the United States pay the company $2.00 for the right to process sufficient gas to yield one thousand cubic feet of helium.' 292 F.Supp. at 652. The evidence shows that in arriving at the unit prices in the Helex contracts the government negotiated 'on the basis of costs comparable to those it would incur in a government-owned plant * * *.' Ibid at 657. Included in the cost build-up was a payment of $2 per Mcf for helium 'contained in natural gas delivered at the extraction plant for processing.' Ibid. We express no opinion as to what such value actually is. For the purpose of this opinion, it is enough to say that recognition of helium value in the volumes of gas processed in the plants results in a price substantially higher than the FPC service rate.
 
 
 58
 The typical contract between a lessee-producer and a pipeline contains a recital clause, a definition of gas, a dedication of described acreage, reservations if any, a statement of quantities, pricing provisions in terms of Mcf ordinarily with escalation, arbitration, or negotiation provisions, quality standards based on Btu content and impurities, statement of duration of contract, methods of measurement, billing and payment procedures, and warranties of title. The trial court's analysis of these contracts need not be repeated here. See 292 F.Supp. at 669-672.
 
 
 59
 The lessee-producers say that gas and natural gas as used in the contracts mean gaseous hydrocarbons and hence do not include helium. They rely on definitions found in Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 8 Cir., 359 F.2d 675, 680-684, and Deep South Oil Company of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882, 888, and on various governmental publications and bulletins. The trial court, after referring to conflicting testimony of industry uses, found that no such usage existed and commented that no gas naturally occurring in the Hugoton area consists solely of hydrocarbons. See 292 F.Supp. at 672-673. We are bound by this finding because it is supported by substantial evidence and is not clearly erroneous.
 
 
 60
 Relying on the quality clauses calling for Btu adjustments, the lessee-producers argue that the pipelines purchased not natural gas but energy and that the energy is derived solely from hydrocarbons. The effect of these adjustments is emphasized in the separate brief of Pan American Petroleum Corporation which has a contract with Cities Service covering approximately 600,000 acres and 725 wells. Certain of the gas is unmerchantable unless mixed with other gas. Pan American says in substance that it is penalized by the price reduction and then Cities Service uses helium, one of the components causing the reduction, to make a profit.
 
 
 61
 In Permian Basin Area Rate Cases, 390 U.S. 747, 809-813, 88 S.Ct. 1344, 20 L.Ed.2d 312, the Court approved quality adjustments dependent on Btu content. In our opinion provisions for such adjustments do not convert the contracts into sales of energy. The contracts provide for the sale and purchase of gas on a volumetric basis. The district court was correct in holding that 'the plain language of contracts providing for the purchase of gas' controls. See 292 F.Supp. at 676.
 
 
 62
 This brings us to what we consider to be the decisive point. Helium, a commodity not regulated in price, is produced as a component of natural gas which is price-regulated. The problem is whether the FPC service rate for natural gas includes the contained helium.
 
 
 63
 There can be no doubt of the power and duty of FPC to regulate the price of natural gas transmitted interstate for resale. The objective of such regulation is the protection of the consumer. The FPC has no interest in the components of the gas other than the effect which they may have on its quality as a fuel. The Bureau of Mines is concerned with prevention of helium waste which occurs when the gas consumers vent it into the atmosphere with fuel combustion residue.
 
 
 64
 Section 15 of the 1960 Helium Act Amendments, 50 U.S.C. 167m, declares the purposes of the statute to be the encouragement of individual enterprise in the development of helium and the assurance of a sustained supply of helium for governmental activities. The Secretary of Interior is authorized to make longterm contracts for the acquisition, processing, has the eminent-domain power to acquire has the emient-domain power to acquire the helium in helium-bearing natural gas. A new basis is provided for establishing the price of helium. The owners of helium extraction plants may not sell to a private purc aser at price lower than that paid by a government agency. The licensing of private sales is under regulations made by the Secretary. Appropriate provisions are made for financing the program.
 
 
 65
 The argument centers around 11, 50 U.S.C. 167i.[5] This says that the Natural Gas Act does not apply 'to the sale, extraction, processing, transportation, or storage of helium either prior to or subsequent to the separation of such helium from the natural gas with which it is commingled.' It also provides that in the determination of rates of a natural gas company there shall be excluded (1) all income from helium, (2) all direct costs in the extraction, processing, transportation, and storage of helium, and (3) the portion of joint costs allocated to helium 'on a volumetric basis.'
 
 
 66
 Senate Report No. 1814, 2 U.S.Cong. & Adm.News '60, pp. 3595, 3599, succinctly states the purpose of this section.
 
 
 67
 'Section 11 covers the jurisdiction of the Federal Power Commission in this area. The section makes it clear that the Federal Power Commission retains its jurisdiction over natural gas containing helium but has no jurisdiction over helium itself.'
 
 
 68
 Other legislative history confirms this purpose.[6]
 
 
 69
 The only decided case concerning 11 is Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 8 Cir., 359 F.2d 675. Panhandle applied to FPC for a certificate to use its pipeline system to transport gas to the National helium plant. The court said that plant shrinkage of the gas stream consisted of fuel gas, helium, liquefied hydrocarbons, and purge. FPC ordered Panhandle to amend its application to cover hydrocarbons which were liquefied and sold as well as the fuel gas. Panhandle sought court review and urged that the FPC order violated 11. The court held that it did not and sustained the order on the basis that it applied only to the transportation of hydrocarbons, not helium. The court reviewed the legislative history of 11 and concluded that FPC had no jurisdiction over the helium either while commingled or after extraction and that such exemption does not prevent FPC from exercising jurisdiction over helium-bearing gas. Ibid at 679.
 
 
 70
 The trial court in the case at bar concluded that 11 does not alter the scope of the gas purchase contracts and
 
 
 71
 '* * * does not require that persons contracting for the sale of gas contract separately for the sale of the helium constituent. It merely permits them to do so, and when they have not, the contract must stand as it is written.' 292 F.Supp. at 680.
 
 
 72
 On the record presented, the denial to the lessee-producers of any recourse under the nonapplicability clause of 11 is startling. The evidence is convincing that 99% Of the nation's recoverable helium supply is in the Hugoton area, that this area was about 95% Developed before the 1960 amendments, and that, with insignificant exceptions, the controlling contracts had been executed long before 1960. The effect of the trial court's decision is to deny application of 11 to the facts presented. We find nothing in the legislative history, and our attention is directed to nothing therein, which shows a congressional intent to deprive the lessee-producers of all benefit from the enhanced helium value, to deny the landowners royalty on the increased value of the gas produced from their lands, or to permit the pipelines to retain all profit from the helium value by obtaining the commingled helium at the FPC service rate.
 
 
 73
 The issue must be determined in the context in which it is presented. 'The purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas.' CATCO, Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. at 388, 79 S.Ct. at 1253. The Helium Act Amendments are designed to assure a sustained supply of helium for governmental and industrial needs. The Natural Gas Act and the Helium Act Amendments must, if possible, be reconciled to produce a 'symmetrical whole.' Panhandle Eastern Pipe Line Company v. Federal Power Commission, 8 Cir., 359 F.2d 675, 679.
 
 
 74
 Some incidental matters must be mentioned. Section 2(3) of the 1960 amendments, 50 U.S.C. 167(3), defines 'helium-bearing natural gas' and 'helium-gas mixture' to mean respectively, 'natural gas and gas mixtures containing threetenths of 1 per centum or more of helium by volume.' We find no pertinency in this because 11, which relates to the applicability of the Natural Gas Act, uses neither phrase.
 
 
 75
 Section 5(a), 50 U.S.C. 167c(a), authorizes regulations for licensing sales and transportation of helium and says that:
 
 
 76
 'For the purpose of this section, the term 'helium' shall mean helium, after extraction from helium-bearing natural gas or helium-gas mixtures, in a regined or semirefined state suitable for use.'
 
 
 77
 Section 5 has nothing to do with 11. To read its definition of helium into 11 would be to delete the words 'prior to' from 11 and the words 'For the purpose of this section' from 5.
 
 
 78
 The lessee-producers point out the familiar and common statement of the FPC in its rate orders that it is 'acting pursuant to the authority granted by the Natural Gas Act.' See e.g. Order No. 264, 29 F.P.C. 589. This is a statement of the statutory justification of the action taken. We find it of no pertinence in the reconciliation of the two statutes.
 
 
 79
 Section 11, after stating the nonapplicability of the Natural Gas Act, excludes from consideration in FPC rate determination all income from sale of helium, all direct costs pertaining to helium, and a portion of the indirect costs allocated to helium on a volumetric basis. In our opinion the purpose of these provisions is to encourage private participation in the helium program by assurance that rate of return will not be determined by conventional FPC standards. The statute furnishes a profit incentive. The mentioned provisions do not detract from the preceding clause of 11 declaring the nonapplicability of the Natural Gas Act. We find nothing in the record which indicates any use of the exclusions which would have effect on the construction of 11.
 
 
 80
 The situation is that a nonregulated commodity (helium) is necessarily produced in conjunction with a regulated commodity (natural gas). The Helex companies insist that the price for the regulated commodity includes the nonregulated commodity. The lessee-producers emphasize the rule of rate regulation that there can be no deviation from the lawful rate for a regulated commodity or service. See United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373, and Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912. They point to several decisions which hold that the furnishing of services was an improper deviation from ICC rates. See United States v. Wabash R.R. Co., 321 U.S. 403, 64 S.Ct. 752, 88 L.Ed. 827 (spotting freight cars in plant yard); Baltimore & Ohio R.R.Co. v. United States, 305 U.S. 507, 59 S.Ct. 284, 83 L.Ed. 318 (in-transit warehousing at less than cost): and Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953 (installation without charge of grain doors in freight cars). The lessee-producers equate the nonpayment for the helium content of the gas with the noncollection of paid costs in the railroad rebate cases.
 
 
 81
 In answer the Helex companies say that under the Natural Gas Act the FPC fixes ceiling prices and does not impose a flat rate. Although this is true, the ceiling rate, or the lower filed rate, is the lawful rate and there may be no deviation therefrom. See Western Union Telegraph Co. v. Esteve Brothers & Co., 256 U.S. 566, 571, 41 S.Ct. 584, 65 L.Ed. 1094. Section 4(b) of the Natural Gas Act, 15 U.S.C. 717c(b), forbids 'any undue preference or advantage' to any person.
 
 
 82
 The Helex companies deny any prejudice or disadvantage. They say that the lessee-producers contracted to deliver the gas stream in its entirety and, absent an express reservation, the buyer gets the whole stream for such purposes as it may determine. The premise ignores the effect of the Natural Gas Act. Although the Act does not abrogate private rate contracts as such, see United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 338, 76 S.Ct. 373, 100 L.Ed. 373, it makes fundamental changes in those contracts. The rate must be just and reasonable and, if it is not, the FPC changes it. Provisions for price escalation or price changes by arbitration or renegotiation are rendered ineffective by regulations permitting summary rejection of increased rates based thereon. See Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112. Contract provisions for period of duration are overridden by unlimited certificates, see Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 156, 80 S.Ct. 1392, 4 L.Ed.2d 1623, with the result that the grant of a certificate carries with it a dedication of the gas for the life of the field unless FPC approves withdrawal. Although the contracts are not abrogated, their provisions on price and term are superseded by FPC regulation.
 
 
 83
 The basis of the Helex companies' argument is that there is a contract sale of commingled helium when it is sold as a component of the gas stream under FPC service rates. We are not persuaded. The protection of the Natural Gas Act is for the consumers, not the Helex companies.
 
 
 84
 In 11 of the 1960 Helium Act Amendments, Congress has said that the Natural Gas Act is not applicable to helium operations 'either prior to or subsequent to the separation of such helium from the natural gas with which it is commingled.' In our opinion this means what it says and, if the Natural Gas Act does not apply, a service rate fixed thereunder does not apply to sales of contained helium.
 
 
 85
 The Helex companies read into 11 a distinction between the sale of helium as a separate commodity and by a separate agreement and a sale of helium as a component of the gas stream. They argue that there may be an additional payment for helium in the first instance but not in the second. A sale of the commingled helium as a component of the gas stream is a sale of helium 'prior to * * * the separation of such helium from the natural gas with which it is commingled.' Accordingly, the Natural Gas Act, and the FPC fixed service rates, do not apply.
 
 
 86
 In oral argument, but not in briefs, the Helex companies say that if title to the helium passes under the contracts, interpleader jurisdiction does not lie to permit recovery by the lessee-producers, and they rely on State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 533-537, 87 S.Ct. 1199, 18 L.Ed.2d 270, and Knoll v. Socony Mobil Oil Co., 10 Cir., 369 F.2d 425, 429, cert. denied 386 U.S. 977, 87 S.Ct. 1173, 18 L.Ed.2d 138. The interpleaded fund is the money paid and to be paid by the United States to the Helex companies for the helium gas mixture. The lessee-producers claim a part of that fund on the ground that they have not been paid for the helium content of the gas. In our opinion this is a claim to the fund and is within interpleader jurisdiction. The situation is not changed by the fact that the claim covers only a part of the fund or by the fact that volume, and hence value, is measured at the delivery point. The situation is different from that confronting us in connection with the landowners' claims against the lessee-producers on the grounds of failure to market and abandonment. Those claims have no relation to the fund.
 
 
 87
 The lessee-producers argue that they are entitled to payment of the reasonable value of the helium under equitable principles of quantum meruit and unjust enrichment arising out of mistake. They emphasize the enormity of the mistake by saying that under the three contracts in the interpleaders a total of $743,600,000 will be paid for crude helium in a 22-year period and claim that $125,000,000 of that, as a bare minimum, represents the value of commingled helium before extraction. They contrast this with the negative or de minimis value which the parties mistakenly assumed it would be.
 
 
 88
 The Helex companies insist that the equities favor them. They say that they built the multi-million dollar extraction plants and assumed the necessary risks. They charge that the lessee-producers stood idly by while the risks were taken, the money invested, and the work done by others. In support of the principle that equity does not take from those who earn it and reward those who silently stand aside and await the success of the enterprise, they cite the refreshing authority found in the folk-tale of the Little Red Hen.[7]
 
 
 89
 The lessee-producers answer that, if the remarks of the Little Red Hen are codified as a principle of equity, they are supported thereby because they obtained leases and conducted drilling, production, and delivery operations which placed the commingled helium into the hands of the Helex companies.
 
 
 90
 The activities of the Little Red Hen were not those of a public utility, and neither the product nor the ingredients thereof were subject to governmental rate regulation. Therein lies the difference. In our opinion private contract law and the principles applicable thereto are not controlling. This makes it unnecessary for us to delve into the many cases and texts bearing on the respective rights of parties to private contracts.
 
 
 91
 Common provisions of the gas purchase contracts call for periodic price escalation, arbitration or renegotiation. These provisions have been largely nullified by FPC regulations. The situation is illustrated by the plight of Ashland Oil & Refining Company which sells to Cities Service gas from over 100 Hugoton wells. The 1948 contract has a special price arbitration provision operative on 5-year periods. In 1961 the rate was raised to 12cents plus 1.75cents for gathering. In the 1966 negotiations for a new price Ashland offered to accept a price applicable to natural gas under FPC jurisdiction plus a separate price for nonjurisdictional helium. Cities Service insisted on a single price because the contract did not provide for dual price structure. The matter went to arbitration under an agreement to include helium in the arbitrated price. The arbitrator fixed a price of 15cents plus 1.75cents for gathering. FPC suspended the rate and after suspension it went into effect subjuct to refund with interest. The Hugoton-Anadarko area rate proceeding fixed a price of 11.3cents for non-gathered and 13.2cents for gathered natural gas. The result shows the inability of a lessee-producer to use a price arbitration provision to secure payment for helium content of natural gas.
 
 
 92
 The trouble lies in the statutory jurisdiction of the FPC on the one hand and of the Department of the Interior, acting through the Bureau of Mines, on the other. The FPC has jurisdiction over natural gas produced, sold and transmitted interstate for resale. it has no jurisdiction over the price of helium. Phillips Petroleum Company v. Ashland Oil & Refining Company, 40 F.P.C. 390, 391-392. The Bureau of Mines has jurisdiction over the conservation of helium. It has no statutory power to fix the value of the contained helium delivered to the pipelines and their affiliates. In 1960 the greatest helium waste was by FPC protected consumers who vented the helium with fuel combustion residues. The FPC seeks to obtain the objectives of the Natural Gas Act through rate control, one aspect of which is the negation of price increase clauses. The lessee-producers cannot secure any increased value from FPC for the helium content of the gas which they produce and sell.
 
 
 93
 The lessee-producers fall into the void created by the two statutes. Neither the FPC nor the Bureau of Mines has jurisdiction over the helium value of the natural gas. Although the gas purchase contracts have not been abrogated, the price provisions thereof have been superseded by FPC rate regulation. The regulated lessee-producers must continue to sell the dedicated gas and have no statutory or contractual method of obtaining any benefit for the increased value. Two results are possible. The first is that the lessee-producers must deliver the gas at the FPC service rate, based on fuel value, and receive nothing for the helium value. This produces a windfall for the pipelines and their Helex subsidiaries. The second is that the lessee-producers are entitled to the reasonable value of the contained helium. This means that the landowners will receive royalties on the value of the helium produced from their lands and the lessee-producers will receive value for the helium content of the natural gas which has been produced by their efforts. We believe that satisfactory utility regulation requires the second result. Otherwise, a utility rate may be used to obtain a commidity or service which is not within the contemplation of that rate.
 
 
 94
 The allowance of a price, above the FPC service rate, for the helium content of Hugoton natural gas, does not adversely affect gas concumers. Their rights to just and reasonable rates are still protected by the Natural Gas Act and the FPC and are not increased by either recognition or payment of heliumvalues. values.
 
 
 95
 In our opinion the reconciliation of the Natural Gas Act and of the 1960 amendments to the Helium Act to attain a symmetrical whole requires the conclusion that the FPC service rates do not apply to deny recovery for the contained helium which is processed in the separation plants. Hence, the lessee-producers recover from the fund the reasonable value of the helium content of the processed gas and they in turn must pay royalty thereon to the landowners. We believe that this result is a valid reconciliation of the statutes and a proper determination of the rights of the parties.
 
 
 96
 Our conclusion that payment is required relates only to the helium content of the processed gas. The record shows that only about 44% Of the produced gas goes through the separation plants. We do not intend that payment to the lessee-producers or royalties to the landowners should include anything for the helium content of the nonprocessed gas. The record does not show any market for the helium commingled with the nonprocessed gas.
 
 
 97
 The reliance of the Helex companies on the warranty of title provisions of the gas purchase contracts does not impress us. The claim of the lessee-producers is that the Helex companies have received the gas without paying for the helium content. In ordinary circumstances restitution or rescission might be an available remedy. Here, neither is practical or legally possible, but when payment is required and not made, the title fails just as surely as it does where either restitution or rescission is appropriate.
 
 
 98
 The Helex companies urge that the helium content cannot be traced back to the delivery points. The landowners and lessee-producers disagree. On the state of the record we reject the position of the Helex companies. The helium content can be measured at the location of the orifice meters which determine the volumes. The lessee-producers seem to have no difficulty in determining volumes as a basis for royalty payments. Our attention is directed to nothing which makes the determination of the helium content either difficult or impossible.
 
 
 99
 One issue remains. The trial court assessed the costs, including attorneys' fees, against the fund. Such costs are estimated to be between a million and a million and a half dollars. The Helex companies say that such assessment of costs violates the principles stated in Hobbs v. McLean, 117 U.S. 567, 582, 6 S.Ct. 870, 29 L.Ed. 940. Our disposition of the case makes necessary reconsideration of the cost ijjue by the trial court. We express no opinion with regard thereto.
 
 
 100
 In No. W-3009, the Tort Claims action, and in No. W-3159, the Tucker Act action, the judgments are severally affirmed.
 
 
 101
 In the interpleader actions, the judgments are severally reversed and the cases remanded to the district court for further consideration in the light of this opinion.
 
 
 102
 The assessment of costs on these appeals is subject to future court action. The court notes that the 88 appeals have been presented and determined on a consolidated record. Within 14 days from the filing of this opinion, or such further time as the court may allow, the parties shall present their itemized and verified bills of costs, if any, and whatever statements they may care to make in regard to the division and assessment of costs.
 
 
 
 *The above caption was adopted in a court-approved stipulation. These 88 appeals are from a judgment entered in eight consolidated civil actions, all filed in, or tranaferred to, the United States District Court for the District of Kansas. In one aspect or another, each is a class action. For convenience, the parties are divided into four groups, (1) the landowners, (2) the lessee-producers, (3) the Helex group, and (4) the United States.
 
 
 C
 regulation of the pipelines has been on a conventional, cost-of-service, public utility basis which was found undesirable in application to the independent producers. In its CATCO decision, Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, the Supreme Court directed the FPC, in protection of the public interest, to hold the line on rate increases. Responsive thereto, the FPC established in-line rates on an area basis. These rates are specified in FPC Statement of General Policy No. 61-1, issued September 28, 1960. See 18 CFR 2.56 and amendments thereto. The effect thereof is that FPC will not certificate initial rates, and will suspend increased rates, which exceed the prescribed levels. The service rates fixed for Hugoton were 11cents per Mcf. FPC area rate making was upheld by the Supreme Court in Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312. The record shows that in Area Rate Proceeding, et al. (Hugoton-Anadarko Area), Docket No. AR 64-1, the presiding examiner's decision, which we are told at argument has been approved by the FPC so far as pertinent here, fixed the service rates for willhead deliveries in the Hugoton area at 12.1cents in the Texas panhandle, 11.9cents in the Oklahoma panhandle, and 11.3cents in Kansas. The Helex group and the United States say in effect that these service rates fix the prices which the lesseeproducers can receive from the pipelines for Hugoton gas, including its helium content
 
 
 [1]
 For the history of helium and the programs of the United States for its conservation see Clifford W. Seibel's book 'Helium-- Child of the Sun,' 1968, University of Kansas Press
 
 
 [2]
 A March 5, 1962, memo by the U.S. General Accounting Office regarding negotiation of helium contracts contains this statement: 'Mr. Wheeler (Assistant Director, Helium, Bureau of Mines) advised that in cost negotiations, the contractors were allowed, as part of the unit price, a helium payment of about $2.00 a thousand cubic feet (MCF) of helium delivered because the natural gas companies believed that they could not warrant clear and unrestricted title to the helium. The companies contended that the gas rights owned permitted them to sell natural gas and not helium. Therefore, in order to provide for possible future payments to lessees, the companies insisted upon a helium payment of $2.00 a MCF for helium delivered. Although there has not been any known court cases on this subject, Mr. Wheeler stated that, in essence, this payment provides for a contingency in the event that (1) the companies are sued by lessees, (2) the court renders a decision that the companies do not have clear title to the helium contained in natural gas and (3) the companies are liable to pay third parties for the helium extracted from natural gas. (Over the life of the four negotiated contracts, this helium payment will amount to an estimated $125 million.)'
 
 
 [3]
 The pertinent provisions of this form are:
 '1. That lessor, for and in consideration of the sum of One and No/100 . . . Dollars ($1.00), in hand paid, and of the covenants and agreements hereinafter contained to be performed by the lessee, has this day granted and leased and hereby grants, leases and lets unto the lessee for the purpose of mining and operating for and producing oil and gas, casinghead gas and casinghead gasoline, laying pipe lines, building tanks, storing oil, building power stations, telephone lines and other structures thereon to produce, save, take care of and manufacture all of such substances, and for housing and boarding employees, the following described tract of land * * *.
 '2. This lease shall remain in force for a term ending October 23, 1951, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline, or any of them is produced.
 '4. Lessee shall pay lessor monthly as royalty: (a) on gas marketed from each well, one-eighth (1/8) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then, one-eighth (1/8) of the market value thereof at the well; (b) on gas used by lessee for the extraction of casinghead gasoline, one-eighth (1/8) of the value of the natural gasoline content as determined by the Natural Gasoline Association of America revised contract, adopted April 4, 1939; * * *. Lessor shall have the privilege at his own risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling located on the leased premises by making his own connections thereto.
 '8. The lessee shall have the right to use free of cost, gas, oil and water found on said land for its operations thereon, except water from wells of the lessor. * * *'
 
 
 [4]
 FPC regulations, 18 CFR 154.91(a) (1969), define independent producer as 'any person as defined in the Natural Gas Act who is engaged in the production or gathering of natural gas and who sells natural gas in interstate commerce for resale, but who is not engaged in the transportation of natural gas (other than gathering) by pipeline in interstate commerce.'
 
 
 [5]
 This section reads in its entirety: 'The provisions of the Natural Gas Act of June 21, 1938 (52 Stat. 821; 15 U.S.C. 717-717w), as amended, shall not be applicable to the sale, extraction, processing, transportation, or storage of helium either prior to or subsequent to the separation of such helium from the natural gas with which it is commingled, whether or not the provisions of such Act apply to such natural gas, and in determining the rates of a natural gas company under sections 4 and 5 of the Natural Gas Act, as amended, whenever helium is extracted from helium-bearing natrual gas, there shall be excluded (1) all income received from the asle of helium; (2) all direct costs incurred in the ectraction, processing, compression, transportation or storage of helium; and (3) that portion of joint costs of exploration, production, gathering, extraction, processing, compression, transportation or storage divided and allocated to helium on a volumetric basis.'
 
 
 [6]
 See House Report No. 1552, 88th Congress. Debates in the House and Senate are found in 106 Cong.Rec. pages 9089-9095, 15119-15125, 18536-18538, 18544- 18546, 18602-18609, and 18902-18904. These appear in the trial record as Helex Ex. 281
 
 
 [7]
 As quoted in the brief of the Helex companies: 'You remember that I planted the wheat, and cut it, I threshed it and carried it to mill, I made the bread and baked it-- and now all of you would help me eat it. No, indeed.' See V. S. Hutchinson, Chimney Corner Stories (1925) 63, 65, published by Minton Balch and Company, New York