No. 38,462

Fred L. Hans, Administrator of Estate of Louis Trester, Deceased, *Appellee,* v. Great Bend Brick & Tile Company, *Appellee,* Edwin N. Carlson, *Appellant,* James A. Cassler, *Appellant,* Paul Lackie, *Appellant.*

(241 P. 2d 475)

Opinion filed March 8, 1952.

*Barton Carothers,* of Great Bend, and *James A. Cassler, Paul Lackie,* and *Charles D. Johnson,* all of McPherson, were on the briefs for the appellants.

*Herbert Diets* and *Boyce P. Hardman,* both of Great Bend, were on the briefs for the appellee.

The opinion of the court was delivered by

Harvey, C. J.: On December 22, 1948, Louis Trester brought this action in the district court of Barton county for the determina-

tion of the rights of the parties under an instrument entitled "Sale of Oil and Gas Royalty" and to have it decreed that the contesting defendants (now appellants) had no title or interest to certain clay deposits on the land in question. A trial by the court resulted in judgment for plaintiff and the contesting defendants have appealed.

The principal facts are not controverted and may be stated as follows: Louis Trester was the owner of a described eighty-acre tract of land in Barton county. On October 12, 1942, he and his wife executed an oil and gas lease covering the property for the primary term of ten years to one Chester H. Goode, who assigned the same to The Texas Company, Inc., which company completed the drilling of a producing oil well on the property in September, 1948. There is no controversy in this case respecting this lease and it has been in full force and effect since it was first executed.

On June 18, 1945, Louis Trester and his wife executed to Edwin N. Carlson an instrument prepared by him entitled "Sale of Oil and Gas Royalty" which reads as follows:

"KNOW ALL MEN BY THESE PRESENTS, That Louis Trester and Mabel Trester, his wife, of Barton County, State of Kansas for and in consideration of the sum of One and no/100 DOLLARS ($1.00) cash in hand paid by Edwin N. Carlson hereinafter called Grantee, the receipt of which is hereby acknowledged, have granted, sold, conveyed, assigned and delivered, and by these presents do grant, sell, convey, assign and deliver unto said Grantee an undivided one-half (½) interest in and to all of the oil, gas and other minerals in and under, and that may be produced from the following described land situated in Barton County, State of Kansas to-wit: The South Half of the Southwest Quarter (S ½ of SW ¼) of Section 21 Township 18 S. Range 13 W. containing 80 acres more or less, together with the right of ingress and egress at all times for the purpose of mining, drilling and exploring said lands for oil, gas and other minerals and removing the same therefrom with the right at any time to remove any or all equipment in connection therewith.

"Said land being now under an oil and gas lease executed in favor of, as appears of record, it is understood and agreed that this sale is made subject to the terms of said lease but covers and includes One-Half (½) of all the oil royalty, and gas rental or royalty due and to be paid under the terms of said lease.

"It is understood and agreed that one-half (½) of the money rentals which may be paid to extend the term within which a well may be begun under the terms of said lease is to be paid to the said Grantee and in the event that the above described lease for any reason becomes cancelled or forfeited then and in that event an undivided one-half (½) of the lease interests and all future rentals and bonuses on said land for oil, gas and other mineral privileges shall be owned by the said Grantee Edwin N. Carlson owning one-half (½) of all oil, gas, and other minerals in and under said lands, together with one half (½) interest in all future events.

"To Have and to Hold the above described property, together with all and singular the rights, appurtenances thereto in anywise belonging unto the said Grantee, herein, his heirs and assigns for a period of the next fifteen years from June 18th, 1945, and as long thereafter as oil and/or gas is produced from these premises or the property is being developed or operated and grantors do hereby bind themselves, their heirs, excutors and administrators to warrant and forever defend all and singular the said property unto said Grantee herein, his heirs and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof, and agree that the Grantee shall have the right at any time to redeem for Grantors by payment, any mortgage, taxes or other liens on the above described lands, in the event of default of payment by Grantors, and be subrogated to the rights of the holder thereof.

"Witness their hands this 18th day of June, 1945."

Later Edwin N. Carlson conveyed an interest in this instrument to James A. Cassler and to Paul Lackie. The three of them are the owners of whatever rights that instrument conveys.

On March 2, 1946, Louis Trester and his wife executed to one McKean Carter a lease covering about sixteen acres of land in the corner of the eighty-acre tract owned by Trester and covered by the two instruments previously mentioned, which after stating Trester and his wife as lessors and McKean Carter as lessee reads in part:

"Witnesseth, That the said lessor for and in consideration of One and other Dollars, cash in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements herein contained on the part of the lessee to be paid, kept and performed; has granted, demised, leased and let unto the said lessee for the sole and only purpose of mining, quarrying and operating for clays, shales and other surface, or near the surface minerals, for ceramic and building purposes; for building purposes, for building roads, laying gas lines for power and heat, building power stations and structures thereon to produce, remove, save, treat and take care of said products; together with the right of ingress and egress at all times, all that certain tract of land situated in Barton County, State of Kansas, described as follows:"

This was followed by a description of the premises leased, a provision fixing the primary term of the lease at forty years, and a provision by which the lessee agreed to pay lessors a stated sum "per cubic yard in place for all clays, shales, or other surface or near the surface minerals, mined and quarried and used off the premises or removed therefrom." It further provided:

"Lessee agrees to build a good five (5) wire fence to separate the operational area from nonoperational area. Lessee shall have the right of ingress and egress at all times to the leased premises through the gate and roadway now running from Highway 281 to the farm buildings. Wells for water supply may be drilled on the leased premises. Pipe lines for water or gas supply shall be buried below plow depth on nonoperational tracts."

There were further provisions about the assignments of the lease. McKean Carter assigned this lease to defendant, Great Bend Brick & Tile Company, which in 1947 began using the clay and shale on the leased premises for the making of brick.

Under date of November 22, 1946, the appellants, Carlson, Lackie and Cassler, and their respective spouses, executed to McKean Carter a clay and shale mining lease. The form of this instrument was the same as that executed by Louis Trester and wife to McKean Carter on February 22, 1946, the only difference being in the names of the grantors and in the date. This instrument was duly assigned to the Great Bend Brick & Tile Company. At the beginning of the trial it was stipulated in open court that there were two clay and shale mining leases given to McKean Carter, one signed by Louis Trester and wife and the other signed by appellants and their spouses, which leases had been duly assigned to the Great Bend Brick & Tile Company. At the trial these instruments were all offered in evidence. There was very little parol testimony. Louis Trester testified that he was the owner of the eighty-acre tract of land involved; that he had given an oil and gas lease upon the property; that he had also given the lease to McKean Carter under date of February 22, 1946, previously noted herein; that the clay referred to therein is at the top of the hill and that there is soil over it; that he was paid for the land that was taken off of the top of the clay; that the Brick & Tile Company has excavated the clay to a depth of twenty-five feet; that the clay is located on the hill; that the company digs out the clay; that the hill extends above the surrounding territory; that it is abrupt on one side, and that the clay could be seen on the side of the hill—the bluff; that the hill is covered with pasture land and there is soil on top of the clay. Plaintiff's wife testified that there was a place on the abrupt side of the hill where she could see clay from her house, but did not know what it was; that the clay was being taken out by shovel and plow and loaded into trucks. Both Trester and his wife were asked questions as to the conversation with Carlson at the time he obtained the instrument designated "Sale of Oil and Gas Royalty." Defendants objected to this line of testimony. The court first received it subject to objections and later sustained the objections and struck the testimony.

The trial court made findings of fact to the effect that plaintiff is the owner of the real estate; that on August 12, 1942, he executed

an oil and gas lease in the usual form; that on June 18, 1945, he executed an instrument entitled "Sale of Oil and Gas Royalty" to the defendant Carlson; that on November 6, 1946, the defendant Carlson executed an instrument entitled "Sale of Oil and Gas Royalty" to the other defendants, all of which instruments were properly recorded. The court further found that on March 2, 1946, plaintiff executed an instrument entitled "Clay and Shale Mining Lease" in favor of Carter as lessee covering part of the real estate described in the former instruments, and that this lease was later assigned to the Great Bend Brick & Tile Company. The court further found:

"4. There is on the real estate of the plaintiff, a clay hill, which stands above the surrounding real estate. This clay hill is covered over with growing grass. In some places the clay is at or near the surface of the real estate. In other places there is a foot or two of surface covering above the clay. This clay hill is a part of the real estate described in the conveyance in paragraph three. The amount of clay varies in depth over the hill from ten to twenty-five feet deep. The Great Bend Brick and Tile Company scoop up the clay and the surface together, separate the soils, and from this clay make brick."

The court made a statement that the claim of defendants Carlson, Lackie and Cassler is that the word "other minerals" in the instrument dated June 18, 1945, entitled "Sale of Oil and Gas Royalty," includes this clay and that they are entitled to their proportionate share of the sum paid by the Great Bend Brick & Tile Company under the "Clay and Shale Mining Lease." It further found: "The clay was not being used to make brick on June 18, 1945." The court's conclusion of law reads:

"The Court concludes that the word 'other minerals' used in the conveyance of June 18, 1945, (Sale of Oil and Gas Royalty) does not include the clay described in finding number four above."

We concur in the trial court's conclusion.

In this court the argument of counsel for appellants runs as follows: Clay is a mineral, citing dictionary definitions; the instrument dated June 18, 1945, entitled "Sale of Oil and Gas Royalty," conveys to the grantee certain interests in "oil, gas and other minerals"; hence of necessity it includes clay. This conclusion is too broad. It is true that in classifying things as animal, vegetable and mineral, everything that goes to make up the earth comes within the general classification of minerals. But this general classification cannot be used for the interpretation of instruments granting specific rights. With respect to that matter the term "mineral" is not a definite one capable of universal application. It is susceptible to limitations ac-

cording to the intention of the parties using it, and in determining its meaning in a specific instrument not only the language of the instrument in which it occurs but also the relative positions of the parties interested and the substance of the transaction which the instrument embodies must be taken into account.

Here, the parties were dealing, primarily at least, with oil and gas. The grantor of the instrument in question previously had executed to another party an oil and gas lease in the usual form. While the wording of that instrument is not shown by the record we think we are justified in assuming that it gave to the lessee therein, or his assigns, the exclusive right to go upon the premises to explore for oil and gas and to produce those substances, if found. Perhaps it said "oil and gas and other minerals," but we are uncertain as to that phrase being embodied in the lease. It is not contended that the lessee under the oil and gas lease would have had any right to dig and carry away from one small area of the leased premises the earth, clay and other substances as embodied in the overall meaning of minerals, as above mentioned, to a depth of twenty-five or more feet. We think a holding that could be done would be startling to the owners of land and to holders of oil and gas leases thereon throughout the state.

Since the trial court did not pass upon the questions we are not called upon here to determine whether the instrument in question should be classified as a "mineral deed" or simply as "sale of oil and gas royalty." The parties were competent to execute either type of instrument. (Compare *Shaffer v. Kansas Farmers Union Royalty Co.*, 146 Kan. 84, 69 P. 2d 4, with *Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 160 P. 2d 246.) Neither are we called upon to determine whether it would be separately taxable under our statute. (G. S. 1949, 79-420.)

Clay is common in Kansas. In much of the area of the state clay is found under a top soil of not more than some six inches to two feet thick, and it is a historical fact that throughout the history of the state brick has been made at many places in the state from clay locally found. We limit this decision to the record before us. There is no controlling decision of our court. Few that are helpful are found elsewhere. Most of them are collected in the annotations in 17 A. L. R. 156, 86 A. L. R. 983 and 148 A. L. R. 780.

The judgment of the trial court is affirmed.

THIELE, WEDELL and PRICE, JJ., concur in the result.