694 P.2d 299

**Ransom Theodore SPURLOCK and Vernie Maria Spurlock, his wife; and Charles Patrick Spurlock and Nancy Jeneen Spurlock, his wife, Plaintiffs-Appellees,**

v.

**SANTA FE PACIFIC RAILROAD COMPANY, a corporation; and Kerr-McGee Corporation, a Delaware corporation, Defendants-Appellants.**

No. 1 CA–CIV 6938.

Court of Appeals of Arizona, Division 1, Department C.

Oct. 18, 1984.

Review Denied Jan. 29, 1985.

**472**

Martori, Meyer, Hendricks & Victor, P.C. by Robert L. Palmer, Ron Kilgard and James A. Bush, Phoenix, for defendant-appellant Kerr-McGee Corp.

Fennemore, Craig, von Ammon, Udall & Powers, P.C. by Philip E. von Ammon, Donald R. Gilbert and Timothy Berg, Phoenix, for defendant-appellant Santa Fe Pacific R. Co.

Jack E. Evans, Ltd. by Jack E. Evans, Phoenix, for plaintiffs-appellees.

OPINION

MEYERSON, Judge.

I. **NATURE OF THE ACTION**

The issues involved in this appeal arise from an action filed by Ransom and Vernie Spurlock and Charles and Nancy Spurlock (hereinafter collectively referred to as Spurlock) charging the defendants-appel-

lants with the conversion of helium extracted from deposits underlying lands owned by Spurlock.

The conversion charges against defendant Santa Fe Pacific Railroad Company (Santa Fe Pacific) were based on the extraction of helium from underneath Spurlock's lands by various third parties who had leased mineral rights from Santa Fe Pacific. Santa Fe Pacific previously owned all of the ranch lands involved and claimed ownership of the underlying helium and other substances by reason of a mineral reservation in its original conveyances to Spurlock's predecessors in title. In addition to requesting damages for the conversion of helium, Spurlock also sought to quiet title to the helium as against Santa Fe Pacific. The conversion charges against defendant Kerr-McGee Corporation (Kerr-McGee) were based on the purchase of the raw helium gas by Kerr-McGee from Santa Fe Pacific's mineral lessees for processing at a plant constructed by Kerr-McGee for that purpose.

After the filing of the Spurlock action for conversion of the helium, Santa Fe Pacific filed separate actions against Spurlock seeking to quiet Santa Fe Pacific's title under the mineral reservation clause to nitrogen, potash, petrified wood and industrial clay. Subsequently, Spurlock also filed a quiet title action against Santa Fe Pacific relating to sand and gravel on the lands involved. As to the sand and gravel, Santa Fe Pacific did not claim ownership by reason of the mineral reservation clause, but rather claimed a nonexclusive right to take gravel and ballast for railroad purposes pursuant to a different provision contained in the deeds to Spurlock's predecessors in title. These actions were all consolidated in the trial court proceedings.

After the denial by the trial judge of various motions and cross-motions for summary judgment, the consolidated matters eventually proceeded to trial before a jury.[1] An extended trial lasting approximately eight months was held, and eventually judgments were entered in favor of Spur-

lock and against Santa Fe Pacific and Kerr-McGee on virtually all issues. These judgments quieted title in favor of Spurlock and against Santa Fe Pacific as to all of the substances in issue, with an award to Spurlock of attorney's fees on the quiet title issues.

On the conversion claim, judgment was entered against Santa Fe Pacific in the amount of $664,502 for compensatory damages and in the amount of $20,000,000 for punitive damages. The judgment against Kerr-McGee on the conversion claim was in the amount of $250,305 for compensatory damages and $487,732 for punitive damages. Spurlock was also awarded pre-judgment interest on the compensatory damages awards. Attorney's fees were awarded to Spurlock in the amount of $525,000 against Santa Fe Pacific and $325,000 against Kerr-McGee.

Many issues have been raised in this appeal by Santa Fe Pacific and Kerr-McGee, and we will not attempt in this preliminary overview to state these issues individually or to set forth in detail the complete factual background necessary for their resolution. However, a principal issue involves the trial judge's refusal to grant judgment as a matter of law in favor of Santa Fe Pacific and Kerr-McGee under the mineral reservation clause. Other issues concern alleged misconduct of counsel for Spurlock; the trial judge's legal conclusions regarding the corporate nonexistence of Santa Fe Pacific; the trial judge's conclusion that the mineral reservation clause was void in its entirety; the sufficiency of the evidence to support the amount of compensatory damages awarded; and the amount and propriety of an award for punitive damages in an action for conversion of minerals in place. In light of our holding that judgment as a matter of law should have been rendered in favor of Santa Fe Pacific and Kerr-McGee (on all claims except sand and gravel), we need not reach every issue raised by appellants.

---

1. As to the quiet title claims, the jury's function was advisory only.

## II. THE MINERAL RESERVATION

### A. *Factual Background*

Prior to 1946, Santa Fe Pacific was the owner in fee simple of virtually all of the lawsuit lands. Most of these lands were acquired by Santa Fe Pacific under patents issued by the United States. The remainder of these lands was acquired by warranty deed from the New Mexico and Arizona Land Company. Santa Fe Pacific leased almost all of this property for grazing purposes. During 1945 and 1946, Santa Fe Pacific decided to sell many of its land holdings and offered the lands for sale to its grazing lessees. Each of these offers was made by a letter from E.O. Hemenway, the land commissioner of Santa Fe Pacific, to the grazing lessee, and each letter stated that Santa Fe Pacific intended to "retain all minerals."

Under this program, in three separate transactions, Santa Fe Pacific conveyed what became the lawsuit lands to others. In 1946, Santa Fe Pacific conveyed by warranty deed 864.35 acres to Grace Porter. In 1947, Santa Fe Pacific contracted to sell some 76,000 acres of its holdings to Cowden Livestock Company and approximately 37,000 acres to the partnership of Spurlock & Wetzler. In September of 1951, Santa Fe Pacific issued warranty deeds to Cowden Livestock Company and Spurlock & Wetzler. Each of the three warranty deeds contained an identical reservation. See Section II.B., *infra*.

In 1950, non-combustible helium-bearing gas was discovered in the "Pinta Dome," an area to the west of the lawsuit lands and the Spurlock ranch. Kerr-McGee and others began to explore for and develop this helium-bearing gas. By 1959–60, exploration efforts expanded to the east into an area on the Spurlock ranch known as Navajo Springs, which was largely land subject to the Santa Fe Pacific mineral reservation. Beginning in 1959, Santa Fe Pacific entered into mineral leases for portions of the lawsuit lands with persons interested in exploring for and producing helium gas. In 1960, helium-bearing gas deposits were discovered under the lawsuit lands.

### B. *Law of Other Jurisdictions*

The primary issue in this case is whether a deed reservation of "all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found, upon or under said lands"[2] includes the disputed substances of helium, nitrogen, potash, petrified wood, and industrial clay. Although we find no Arizona cases construing such a reservation, similar provisions have been the source of extensive litigation in other jurisdictions.

All jurisdictions agree that in construing deeds, the court's role is to give effect to the intent of the contracting parties. *E.g.*, *Shulansky v. Michaels*, 14 Ariz. App. 402, 405, 484 P.2d 14, 17 (1971). If the instrument is unambiguous, the intent of the parties must be discerned from the four corners of the document. *E.g.*, *Pass v. Stephens*, 22 Ariz. 461, 466, 198 P. 712, 714 (1921). If, however, the instrument is ambiguous, then extrinsic evidence of intent is admissible. *Id.*, 198 P. at 714.

But beyond agreeing on these basic principles of construction, courts have adopted varying approaches to ascertain what substances the parties intended to include in a general mineral reservation. Courts have focused their analysis on the proper definition of "mineral" with widely divergent results. Because of the importance of this issue in Arizona, we believe it appropriate to summarize some of the common approaches used in other jurisdictions.

---

**2.** The reservation, in its entirety, is as follows:

Grantor expressly reserves and excepts all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found, upon or under said lands, with the right to prospect for, mine and remove the same, and to use so much of the surface of said lands as shall be necessary and convenient for shafts, wells, tanks, pipe lines, rights of way, railroad tracks, storage purposes, and other and different structures and purposes necessary and convenient for the digging, drilling and working of any mines or wells which may be operated on said lands.

Some courts find the term mineral[3] to be inherently (and always) ambiguous and admit extrinsic evidence to determine the parties' intent. In Colorado, for example, extrinsic evidence is admissible to show what the word mineral means "in the vernacular of the mining world, the commercial world and [to] landowners at the time of the grant, and whether the particular substance was so regarded as a mineral." *Morrison v. Socolofsky*, 43 Colo.App. 212, 213, 600 P.2d 121, 122 (1979) (quoting *Farrell v. Sayre*, 129 Colo. 368, 373, 270 P.2d 190, 193 (1954)). Thus, in determining whether gravel was included within a reservation of "oil, gas and other minerals," the *Morrison* court concluded that evidence regarding the geological location of gravel with respect to the surface, the impact on the surface of extracting the gravel deposits, the nature of the use of the surface estate, and testimony of geologists-consultants in the gravel industry and of agricultural lenders and landowners on the common meaning of the term mineral at the time of the conveyance, were all properly admissible as bearing on the parties' intent. *Id.* at 214, 600 P.2d at 122.

Likewise the Arkansas courts find the term mineral to be ambiguous and require the admission of extrinsic evidence as to whether the substance at issue would be considered a mineral in the common commercial speech and usage at the time of the conveyance. *See, e.g., Thomas v. Markham & Brown, Inc.*, 353 F.Supp. 498 (E.D. Ark.1973) (pulaskite stone not considered a mineral at the time of the conveyance); *Middleton v. Western Coal & Mining Co.*, 241 F.Supp. 407 (W.D.Ark.1965) ("other minerals" does not include oil and gas).

A second general approach used by many jurisdictions is to find the term mineral to be unambiguous. Under this view, a grant or reservation containing the word mineral is found to completely sever the mineral estate from the surface estate. *Amoco Prod. Co. v. Guild Trust*, 636 F.2d 261, 265 (10th Cir.1980), *cert. denied*, 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) (oil and gas are minerals). In *Union Pac. Land Resources Corp. v. Moench Inv. Co.*, 696 F.2d 88 (10th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1776, 76 L.Ed.2d 348 (1983), the court found a reservation in a conveyance by the Union Pacific Railroad Company, a successor to a federally-chartered corporation, to be unambiguous. The deed reserved to the railroad all "coal and other minerals." Applying Wyoming law, the court found the term minerals was unambiguous and included oil and gas. *Id.* at 93. Other courts use the doctrine of *ejusdem generis* to make the term unambiguous.[4] *Allen v. Farmers Union Co-Op. Royalty Co.*, 538 P.2d 204 (Okla.1975).

Despite the lack of ambiguity, many of these courts still admit extrinsic evidence to ascertain whether the substance at issue is commercially valuable, commonly regarded as a mineral, and/or whether extraction of the substance would result in surface destruction. For example, in *Geothermal Kinetics, Inc. v. Union Oil Co.*, 75 Cal.App.3d 56, 141 Cal.Rptr. 879 (1977), the court found the reservation of "all minerals" reflected the general intent to reserve "those commercially valuable, underground, physical resources of the property." *Id.* at 62, 141 Cal.Rptr. at 882. The court described the expectation of the parties as being that the enjoyment of the mineral estate "would not destroy the sur-

---

**3.** Throughout this opinion the term "mineral" will be used to refer to general mineral reservations regardless of the precise terminology employed. Courts have not differentiated among reservations of "all minerals," "minerals," "minerals of whatever kind," "all minerals whatsoever," etc.

**4.** *Ejusdem generis* is essentially a rule of construction whereby the term minerals is limited to substances of the same species as minerals

previously enumerated. Thus, a lease of "natural gas, petroleum and other mineral substances" would include only those minerals related to oil and gas in nature. *Wulf v. Shultz*, 211 Kan. 724, 508 P.2d 896 (1973). Some courts that determine the term mineral is ambiguous also employ *ejusdem generis* to define what substances are within a general mineral reservation. *See Keller v. Ely*, 192 Kan. 698, 391 P.2d 132 (1964).

face estate and would involve resources distinct from the surface soil." *Id.,* 141 Cal.Rptr. at 882. The trial court found that the "mining" of geothermal steam would not substantially destroy the surface of the property. *Id.* at 61, 141 Cal.Rptr. at 881–82.

Some of these jurisdictions determine that all commercially valuable substances that are commonly understood to be within the technical and/or practical meanings of the term mineral are included in a general mineral reservation, even though development of these substances would result in surface destruction. *See, e.g., Moser v. United States Steel Corp.,* 676 S.W.2d 99 (Tex.1984); *New Mexico & Ariz. Land Co. v. Elkins,* 137 F.Supp. 767 (D.N.M.), *appeal dismissed,* 239 F.2d 645 (10th Cir. 1956). But other courts refuse to include substances whose extraction would result in surface destruction or which possess no distinguishing characteristics from the surface itself. *E.g., Wulf v. Shultz.*

Perhaps because of the disparate results produced by the above approaches, some courts have concluded that the term mineral may be ambiguous or unambiguous depending upon the circumstances of the case. Thus, in Kansas, a reservation of "all of the oil, gas and other minerals in and under, and that may be produced from" the land was ambiguous as to commercial clay, *Hans v. Great Bend Brick & Tile Co.,* 172 Kan. 478, 241 P.2d 475 (1952); but a lease of "natural gas, petroleum and other mineral substances" unambiguously excluded limestone, coal, clay, gypsum, gravel, rock and dirt under the doctrine of *ejusdem generis. Wulf v. Shultz.* In Kentucky, a reservation of all coal and mineral rights unambiguously includes oil and gas, *Kentucky-West Virginia Gas Co. v. Browning,* 521 S.W.2d 516 (Ky.App. 1975), but a reservation of minerals, oil, and gas is ambiguous with respect to clay and sandstone constituting about 75% of the subsurface. *Cumberland Mineral Co. v. United States,* 206 Ct.Cl. 797, 513 F.2d 1399 (1975).

Finally, some courts rely on legislative intent or rules of construction to determine the extent of a mineral reservation. *E.g., Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983) (the term minerals under the Stock-Raising Homestead Act of 1916 includes gravel). California courts have utilized state legislation regulating mineral and geothermal resources to aid in the interpretation of the term mineral. *Pariani v. State,* 105 Cal. App.3d 923, 164 Cal.Rptr. 683 (1980). In Colorado and Washington, grants are to be construed against the grantor. *Bell Petroleum Co. v. Cross V. Cattle Co.,* 492 P.2d 80 (Colo.App.1971); *Weyerhaeuser Co. v. Burlington Northern, Inc.,* 15 Wash.App. 314, 549 P.2d 54 (1976). North Dakota has a statute requiring reservations of certain substances to be specifically and separately set forth in the instrument. *MacMaster v. Onstad,* 86 N.W.2d 36 (N.D.1957). And in a very recent decision, Division Two of this court held that pantano clay was a mineral within the contemplation of Arizona's mineral leasing laws. *Tanner Cos. v. Arizona State Land Dept.,* 142 Ariz. 183, 688 P.2d 1075 (Ariz.App.1984). This holding is of little assistance in the case before us because it concerns the authority of the land department to lease state lands for mineral exploration—a case involving the department's power under an extensive statutory scheme. *See also State Land Dept. v. Tucson Rock & Sand Co.,* 107 Ariz. 74, 481 P.2d 867 (1971).

### C. *Critique of Other Jurisdictions*

Each of the above approaches has its drawbacks. Jurisdictions utilizing the same general approach reach different conclusions as to what substances are minerals. Inconsistent results are even produced within a single jurisdiction. *E.g., compare United States v. 1,253.14 Acres of Land,* 455 F.2d 1177 (10th Cir.1972) (under Colorado law, "all minerals" includes sand and gravel) *with Morrison v. Socolofsky,* 43 Colo.App. 212, 600 P.2d 121 (1979) (reservation of "other minerals" did not include gravel).

Courts that hold mineral to be an ambiguous term are often thrust into a complex and hopeless search for the "true intentions" of the original contracting parties. With the passage of decades and a series of mesne conveyances, this task can be impossible.[5] And, as many courts have noted, attempting to discover the parties' specific intent regarding a substance that was unknown to anyone at the time of the original conveyance is antilogical. *E.g., Northern Nat. Gas Co. v. Grounds,* 441 F.2d 704, 714 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971). The most consistent results produced by these cases are title uncertainty and the need to litigate each mineral reservation to determine what substances it encompasses.[6] "[T]he courts ultimately determine the meaning of the word 'minerals,' and all too often the only reliable rule appears to be that the word 'minerals' means what the courts say it means." Reeves, *The Meaning of the Word "Minerals,"* 54 N.D.L. Rev. 419, 482 (1978).

> To hold the term 'other minerals' ambiguous as a matter of law appears at first glance to be a laudable attempt by the courts to give effect to the intentions of the grantor. However, this assumes that the grantor had a specific and identifiable intent that can be discovered. The discovery of the grantor's intent, particularly in a remote transaction, is difficult. The problem with the ambiguity approach is that it creates instant uncertainty about any conveyance using 'other minerals' or 'all minerals.' It is almost impossible for an outsider or prospective purchaser to determine what was granted or reserved. The effect of this approach is to encourage or increase the amount of litigation to determine the scope of the grant or reservation.

Comment, *A Proposal for the Construction of "Other Minerals" in Idaho,* 18 Idaho L.Rev. 97, 104 (1982) (Comment).

To alleviate these problems, many courts find the term minerals to be unambiguous. Under this approach title uncertainty is minimized and courts are able to avoid the tortuous process of attempting to discover the parties' specific intent. *See, e.g., Moser v. United States Steel Corp.,* 676 S.W.2d 99 (Tex.1984).

> The policy considerations in favor of this interpretation are considerable. An established rule of law provides a reliable means of ascertaining mineral ownership. This certainty is important because of the heavy investment of capital required to develop petroleum and other mineral resources. Without an estab-

---

**5.** The difficulties inherent in this approach are highlighted by the facts of this case. The land which is the subject of this lawsuit was initially held by Santa Fe Pacific. The land was conveyed in three separate transactions to Spurlock's predecessors. Spurlock eventually succeeded to the titles in all three transactions.

The negotiations for these transactions were handled by E.O. Hemenway on behalf of Santa Fe Pacific. He negotiated with Grace Porter about the sale to her; with Ray Cowden about the sale to Cowden Livestock Company; and with J.C. Wetzler about the sale to Spurlock & Wetzler. Mr. Hemenway and Mrs. Porter died before the commencement of these proceedings.

The difficulty in ascertaining the intent of the parties in the three transactions is apparent. Two of the principals are deceased. The remaining participants in the transactions were asked to testify as to their intent about events transpiring almost forty years ago. Much of the trial time was consumed by testimony concerning the intent of the parties to the three conveyances.

**6.** The trial court reasoned that minerals is an ambiguous term because "[t]aking *minerals* from the general trichotomy of animal, vegetable or mineral, it means everything which is not animal or vegetable." Applying this logic, Spurlock argues that the reservation therefore consumes the grant and invalidates it.

The trial court's approach was repudiated by the United States Supreme Court over eighty years ago.

> [T]he scientific division of all matter into the animal, vegetable, or mineral kingdom would be absurd as applied to a grant of lands, since all lands belong to the mineral kingdom, and therefore could not be excepted from the grant without being destructive of it.

*Northern Pac. Ry. Co. v. Soderberg,* 188 U.S. 526, 530, 23 S.Ct. 365, 367, 47 L.Ed. 575, 581 (1903). To apply the rule enunciated by the trial court would result in the reservation consuming the conveyance, a result certainly not intended by the parties. Thus, the animal, mineral, vegetable approach is not correct.

lished rule of law, the courts would necessarily be called upon to interpret numerous reservations. This is evident from the series of cases that result in states following Arkansas authority. With every new technology that develops a use for a particular gas or hard rock mineral, resort is made to the courts. Conservation of judicial resources is another valuable advantage of [this] rule. *Amoco Prod. Co. v. Guild Trust,* 636 F.2d 261, 265 (10th Cir.1980), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981) (quoting *Amoco Prod. Co. v. Guild Trust,* 461 F.Supp. 279, 283 (D.Wyo.1978)).

This approach, however, is not always free from difficulty. In jurisdictions which attempt to narrowly define minerals as only those substances whose extraction does not result in surface destruction, courts must still examine scientific and geological evidence to determine the mineral composition of the land and the impact of mineral production on the surface estate. *Downstate Stone Co. v. United States,* 712 F.2d 1215 (7th Cir.1983). Courts employing a legal standard of those substances "technically or commonly understood" to be minerals may have to admit evidence of custom or usage. *See, e.g., New México & Ariz. Land Co. v. Elkins,* 137 F.Supp. 767 (D.N.M.), *appeal dismissed,* 239 F.2d 645 (10th Cir.1956).

Furthermore, the unambiguous approach may result in "ignoring the intent of parties which might have been discovered through diligent examination of extrinsic evidence." Comment at 101. This problem is exacerbated in jurisdictions employing *ejusdem generis* to arbitrarily and often artificially limit the substances included within the term mineral.[7] *Allen v. Farmers Union Co-op. Royalty Co.,* 538 P.2d 204 (Okla.1975) (reservation of "all oil, gas & mineral rights" does not include copper, silver, gold or any other metallic ores under *ejusdem generis* ); *Hammett Oil Co. v. Gypsy Oil Co.,* 95 Okla. 235, 218 P. 501 (1921) ("oil and gas" does not include casing head gas).

### D. *Conclusion*

#### 1. Ownership

On balance, however, we believe the better reasoned approach is to treat the term minerals as unambiguous. Thus, it becomes the court's duty to determine the extent of a general reservation as a matter of law, without resorting to extrinsic evidence to try to establish any unexpressed, subjective intent of the parties. In this context, we believe a reservation of "all minerals whatsoever" reflects a *general* intent of the parties to sever the surface estate from the underlying mineral estate. *Maynard v. McHenry,* 271 Ky. 642, 113 S.W.2d 13 (1938). It indicates that the parties intended to create two distinct, co-existing, and individually valuable estates. Thus, the grantor retains ownership of all commercially valuable substances separate from the soil, while the grantee assumes ownership of a surface that has value in its use and enjoyment. *See Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 50–55, 103 S.Ct. 2218, 2226–29, 76 L.Ed.2d 400, 411–15 (1983). The grantor further retains ownership of mineral substances that are unknown at the time of the conveyance. *Northern Natural Gas Co. v. Grounds,* 441 F.2d 704 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971). This approach is consistent with the views expressed by the leading commentators. As Professor Eugene Kuntz observed:

> When a general grant or reservation is made of all minerals without qualifying language, it should be apparent that the parties intended to sever the entire mineral estate from the surface estate, leaving the respective owners of each estate with an estate which is enjoyable in a special manner. The manner of enjoy-

---

7. A related problem with the use of *ejusdem generis* is the difficulty· some courts have in determining what is the common characteristic among the minerals enumerated in order to apply the doctrine to disputed substances. *See, e.g., Western Dev. Co. v. Nell,* 4 Utah 2d 112, 288 P.2d 452 (1955); *see generally* Comment at 107–08.

ment of the mineral estate is through extraction and removal of substances from the earth, whereas the enjoyment of the surface is through·retention of such substances as are necessary for the use of the surface, and these respective modes of enjoyment should be taken into account in arriving at the proper subject matter of each estate. The severance of 'minerals' generally should be construed to sever from the surface ownership all substances presently valuable in themselves, apart from their location in the earth, whether their presence is known or not known, and all substances which become valuable through the development of the arts and sciences, and that nothing presently or prospectively valuable as extracted substances would be intended to be excluded from the mineral estate.

1 E. Kuntz, *A Treatise on the Law of Oil and Gas* § 13.3 at 305–06 (1962); Comment, *The Meaning of "Minerals" in Grants and Reservations*, 30 Rocky Mtn. L.Rev. 343, 357 (1958); *see generally* R. Pruitt, *Mineral Terms—Some Problems in Their Use and Definition*, 11 Rocky Mtn.Min.L.Inst. 1 (1966). ·

2. Surface Destruction

Ownership of the mineral estate, however, is not the only issue which must be addressed in construing a mineral reservation. We must also determine what rights the mineral owner possesses to develop his estate. We recognize that in order for both the surface and mineral estates to co-exist and retain their individual value, some accommodation between the respective owners is necessary.

■ In general, the owner of the mineral estate possesses the incidental right of entering, occupying, and utilizing the surface to explore for and develop the underlying minerals. 58 C.J.S. *Mines and Minerals* § 159 (1948). If the grant or reservation specifically authorizes surface destruction by the mineral owner, then courts

should give effect to this intention.[8] Rarely, however, is such a right expressly conferred in the conveying instrument. Nevertheless, the court should examine the four corners of the document and give effect to any specific provisions regulating the use of the surface estate by the mineral owner. *See* Reeves, *The Meaning of the Word "Minerals,"* 54 N.D.L.Rev. 419, 442, 450–53 (1978); *MacMaster v. Onstad*, 86 N.W.2d 36 (N.D.1957).

■ In the absence of such provisions, the court should focus its analysis on the substances reserved or granted. With respect to minerals specified in the conveyance or minerals commercially known to exist at the time of the conveyance, reasonable destruction of the surface estate is permissible. *Christman v. Emineth*, 212 N.W.2d 543 (N.D.1973). The enumeration of such minerals indicates a specific intent on the part of the contracting parties that these substances would be fully developed. In essence, the surface owner knew of and agreed to this burden on his estate. It is logical to assume that parties intending to sever the mineral from the surface estate would contemplate some surface destruction in the development of substances which were commonly known to be commercially valuable minerals at the time of the conveyance. *Schwarz v. State*, 658 S.W.2d 822 (Tex.App.1983).

■ However, no such specific intent can be found with respect to substances which were unknown or had no commercial value at the time of the conveyance. *See, e.g., Pariani v. State*, 105 Cal.App.3d 923, 930, 164 Cal.Rptr. at 683, 687 (1980); *Northern Natural Gas Co. v. Grounds*, 441 F.2d at 714. The holder of the mineral estate owns such substances, but his development of these resources must not substantially interfere with the surface owner's estate. Only in this way can the general intention of the parties to create and enjoy two co-existing, individually valuable estates be given effect.

---

**8.** The reservation in this case grants Santa Fe Pacific the express right to use the surface for

"digging, drilling and working of any mines or wells." See Section IV. B., *infra.*

Many jurisdictions have recognized that the mineral owner's rights to develop his estate are limited when they infringe upon the surface owner's use and enjoyment of the land itself. Generally, courts solve this conflict by determining that the term minerals excludes substances whose extraction would destroy the surface. For example, in *Farrell v. Sayre*, 129 Colo. 368, 270 P.2d 190 (1954), the Supreme Court of Colorado refused to include sand and gravel in a reservation of "all mineral and mineral rights." Emphasizing that most of the surface was composed of sand and gravel, the court concluded that the contracting parties could not have intended to, in effect, "nullify the grant." Such a result would be tantamount to saying that the grantor retained the entire estate, the deed served no useful purpose, and the grantee received nothing. *Id.* at 372–73, 270 P.2d at 192. *See also Downstate Stone Co. v. United States*, 712 F.2d 1215 (7th Cir.1983) (limestone); *Christensen v. Chromalloy Am. Corp.*, Nev., 656 P.2d 844 (1983) (barite); *New Mexico and Arizona Land Co. v. Elkins Ranch, Inc.*, No. 74–235 (D.N.M. Dec. 3, 1974) (limestone); *State Land Bd. v. State Dept. of Fish & Game*, 17 Utah 2d 237, 408 P.2d 707 (1965) (sand and gravel).[9]

While this approach protects the surface owner's estate, it is not necessarily an equitable solution to the problem. By refusing to include such substances in the definition of mineral, ownership of such commercially valuable deposits passes to the surface owner. The surface owner himself is then free to extract and commercially produce the substance. This result appears to contravene the parties' original intention that the grantor retain the ownership and profit potential of the mineral resources. Comment, *The Meaning of "Minerals" in Grants and Reservations*, 30 Rocky Mtn. L.Rev. 343, 351 (1958).

The Supreme Court of Alabama distinguished between the ownership itself of a mineral and the incidental right of the mineral owner to utilize the surface to produce it in *Bibby v. Bunch*, 176 Ala. 585, 58 So. 916 (1912). Recognizing that shale was a mineral and its ownership was retained by the grantor under a reservation of "all minerals and mining rights," the court nonetheless refused to allow shale extraction because of the resultant surface destruction. *Id.* at 588, 58 So. at 917–18. The court concluded that while the mineral owner had the right to some reasonable use of the surface to procure underlying minerals, that right was subservient to the rights of the surface owner to have his estate maintained in its natural condition. *Id.* at 589, 58 So. at 917. *See also New Mexico and Ariz. Land Co. v. Elkins*, 137 F.Supp. 767, 773 (D.N.M.), *appeal dismissed*, 239 F.2d 645 (10th Cir.1956) (finding uranium and thorium to be minerals, but reserving to the surface owner a cause of action against the mineral owner for destruction of his surface interests); *Moser v. United States Steel Corp.*, 676 S.W.2d 99 at 103 (Tex.1984).

■ We believe the distinction drawn by the *Bibby* court is a critical one. It comports with the general intention of the parties to sever the mineral from the surface estate. It gives ownership of commercially valuable substances distinct from the soil to the mineral owner. Yet it also recognizes that rights incidental to that mineral ownership are not unlimited. Thus, as to unspecified minerals, not known to be commercially valuable at the time of the conveyance, the mineral estate owner must not destroy or substantially interfere with the surface owner's right to use and enjoy his land by the mining or taking of minerals.

In the present case, only the issue of ownership rights under the general mineral

---

**9.** Indeed, concern for surface destruction is paramount in the minds of many courts which are called upon to interpret mineral reservations. In our view, the issue of surface destruction is more properly examined as an adjunct to the question of how the mineral estate owner is to exercise his right of ownership. To consider surface destruction as an element of the ownership issue results in inconsistent and varying results which are evidenced in the many reported decisions.

reservation is before us.[10] Issues relating to the effect of extraction of the disputed substances upon the surface estate have not been briefed or argued before this court. Nor do the judgments below purport to rule on these matters. Accordingly, we do not believe it appropriate for this court to speculate as to whether or not production of any minerals would substantially interfere with the surface estate.

### 3. Holding

Under the principles expressed herein, we hold that the term minerals as used in this reservation is unambiguous. A reservation of "all oil, gas, coal and minerals whatsoever, already found or which may hereafter be found" indicates the parties' general intention to sever the mineral from the surface estate. No specific intent to limit this reservation is found within other provisions of the deeds nor is contrary extrinsic evidence of intent admissible to vary its effectiveness.

As a matter of law, we hold that helium,[11] nitrogen potash, industrial clay, and petrified wood are minerals and that Santa Fe Pacific retained ownership of them under the general mineral reservation. See *supra* note 2. All are inorganic, commercially valuable substances which are distinct from the soil itself. As we have previously discussed, the fact that the original contracting parties may have been unaware of the existence or value of these minerals at the time of the conveyance is irrelevant to the question of *ownership*.[12]

With respect to sand and gravel, Santa Fe Pacific claims title by virtue of another reservation in the deeds. This reservation permitted Santa Fe Pacific to come upon the surface and take sand and gravel for "railroad purposes." Because specific mention is made of "gravel and ballast," the foregoing discussion concerning the general mineral reservation is not applicable to these substances. The trial court found that Santa Fe Pacific "has abandoned any right it may have had to take sand and gravel for railroad purposes." Santa Fe Pacific has not raised on appeal any issue concerning error with regard to this finding. Thus, the trial court's judgment quieting title to the sand and gravel in favor of Spurlock is affirmed.

## III. DE JURE AND DE FACTO DISSOLUTION; ULTRA VIRES

All of the judgments in this consolidated action recite that the reservation clause in the deeds from Santa Fe Pacific to Spurlock's predecessors in interest "is void and unenforceable." This ruling is apparently based upon the trial court's conclusion that Santa Fe Pacific was *de jure* and *de facto* dissolved and that the conveyances were therefore *ultra vires* acts. Immediately after the jury verdicts were read the trial judge stated:

THE COURT: So that we leave the courtroom in a position to carry on the post-verdict proceedings, the Court will now enter a ruling on the corporate existence of Santa Fe, and it is the Court's finding that Santa Fe Pacific was de jure and de facto dissolved; that the acts of the defendants were ultra vires, consistent with all of the theories propounded by plaintiffs, Spurlocks.

. . . . .

MR. GILBERT: Would you give that ruling again? I missed part of that.

THE COURT: I had indicated that the Court found that Santa Fe Pacific was de

---

10. Santa Fe Pacific did not claim ownership of sand and gravel under the general mineral reservation either in the trial court or on appeal. Ownership of sand and gravel was claimed under another provision in the conveyance. This issue is addressed separately.

11. Even if we had not determined that the reservation completely severed the subsurface estate in favor of Santa Fe Pacific, the use of the term

"gas" in the reservation would reserve the helium and nitrogen in favor of the railroad. *Northern Natural Gas Co. v. Grounds*, 441 F.2d at 715; *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966).

12. As discussed herein, this knowledge is only relevant to the mineral owner's rights to burden the surface estate in the course of developing and producing these minerals.

jure and de facto dissolved, that the acts were therefore ultra vires—

MR. GILBERT: What acts, Your Honor?

THE COURT: To the extent that they involved any issue in this lawsuit. If there are theories consistent with that that I've overlooked in that simple statement of findings, they would also be adopted.

The trial court's ruling was apparently based upon Spurlock's contention that Santa Fe Pacific had been *de jure* and *de facto* dissolved at the time it conveyed the lawsuit lands to Spurlock's predecessors in interest. Spurlock also argued successfully to the trial court that pursuant to a 1902 federal law, Act of June 27, 1902, ch. 1159, 32 Stat. 405 (1902 Act), Santa Fe Pacific was required to convey the lawsuit lands to the Atchison, Topeka and Santa Fe Railway Company. Thus, Spurlock contends that since Santa Fe Pacific was not empowered to retain title to these lands under the 1902 Act, it could not have been the legal owner of these lands when it subsequently conveyed them to Spurlock's predecessors.[13] Alternatively, Spurlock argues that Santa Fe Pacific's continued ownership of these lands and/or its conveyances to Spurlock's predecessors were *ultra vires* acts under the terms of the 1902 Act. We find it unnecessary, however, to decipher historical events which transpired eighty years ago because we conclude that Spurlock may not challenge the legal existence of Santa Fe Pacific nor complain that the conveyances were *ultra vires*.

### A. *De Jure Dissolution*

■ The power of Congress to charter corporations to effectuate its lawful purposes is well established. *McCulloch v. Maryland*, 4 Wheat. (U.S.) 316, 4 L.Ed. 579 (1819). Congress, in exercising those powers, has incorporated railroad corporations, including the Santa Fe Pacific. Act of March 3, 1897, ch. 374, 29 Stat. 622. Furthermore, "Congress has not only the power to create a corporation to facilitate the performance of governmental functions, but has the power to protect the operations thus validly authorized." *Pittman v. Home Owners' Loan Corp.*, 308 U.S. 21, 32–33, 60 S.Ct. 15, 18, 84 L.Ed. 11, 16 (1939). "[A] power to create implies a power to preserve.... [A] power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve." *McCulloch v. Maryland*, 4 Wheat. (U.S.) at 426, 4 L.Ed. at 606.

■ The respective supremacies of the state and national governments in their particular spheres must be observed in regard to their power to create and destroy corporations. Neither may terminate the existence of a corporation of the other. *State ex rel. Wilcox v. Curtis*, 35 Conn. 374, 378 (1868). Therefore, "no court can declare a forfeiture of franchise or a dissolution of a corporation except the courts of the jurisdiction which created it." J. Beale, *The Law of Foreign Corporations* § 821 (1904). The state courts must, therefore, look to federal law to determine whether a national, congressionally incorporated corporation, has been dissolved *de jure*. *See generally* 16A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7971 (rev. perm. ed. 1979) (Fletcher).

■ Spurlock has been unable to point to any federal enactment which revokes the corporate charter of Santa Fe Pacific. Instead, Spurlock argues that *de jure* dissolution is effectively accomplished by the 1902 Act. We disagree with Spurlock's strained interpretation of this legislation. The act authorized Santa Fe Pacific

to sell or lease its railroad and other property, including all rights, powers, privileges, grants, and franchises, to the

---

**13.** Exhibits admitted at trial establish that in 1903, Santa Fe Pacific actually conveyed its railroad operating properties to the Atchison, Topeka & Santa Fe Railway Company and its land grant lands to the Santa Fe Pacific Development Company. In 1904, the Santa Fe Pacific Development Company conveyed the lawsuit lands back to Santa Fe Pacific. Spurlock refers to certain fraudulent transfers by Santa Fe Pacific, but we find nothing in the record to sustain that contention.

Atchison, Topeka and Santa Fe Railway Company, a corporation of the State of Kansas, its successors and assigns; but such purchaser or lessee shall take, hold, and use the railroad and property sold or leased subject to all duties, obligations, conditions, and restrictions relating thereto which at the time of such sale or lease shall be binding upon said Santa Fe Pacific Railroad Company as fully as though such sale or lease had not been made; and thereupon such purchaser or lessee shall have and enjoy all rights, powers, privileges, grants, and franchises relating to said railroad and property; or any part thereof, that were conferred by Congress upon said Santa Fe Pacific Railroad Company....

32 Stat. at 405. The 1902 Act authorizes Santa Fe Pacific to transfer its railroad and properties to the Atchison, Topeka and Santa Fe Railway Company. The Act does not dissolve Santa Fe Pacific. Nor do we believe it appropriate for the trial court or this court to conjure an unexpressed congressional intent to nullify the corporate existence of the very corporation whose powers Congress was expressly clarifying.

### B. *De Facto Dissolution*

■ Spurlock has argued that Santa Fe Pacific is *de facto* dissolved by virtue of its failure to exercise the rights accorded to it by its articles, or the federal act creating it. This contention is legally and factually unsound.

First, Spurlock has pointed to nothing in the federal law creating Santa Fe Pacific which would even remotely suggest that its corporate existence could be challenged in the state courts. Indeed, the power to dissolve a corporation must find its authority in the law of the sovereign creating the corporation. As in Section III.A., *supra,* we find no federal authority granting to the states the power to dissolve Santa Fe Pacific.

■ Second, even if Congress had given the states the power to dissolve Santa Fe Pacific, the facts in this case would not sanction the exercise of that power.

*De facto* dissolution, in contrast to *de jure* dissolution, is largely a question of fact. The issue is what acts will give rise to a proper determination of corporate nonuse such that a court may declare such corporation *de facto* dissolved. The mere fact that a corporation has stopped doing business does not necessarily constitute a *de facto* dissolution. *Greenville Nat'l Exch. Bank v. Nussbaum,* 154 S.W.2d 672, 674 (Tex. App.1941). A corporation may cease to exist for all practical purposes, and yet not be dissolved as a matter of law. *See Eastern Grain Elevator Corp. v. McGowan,* 95 F.Supp. 40 (W.D.N.Y.1950). A corporation does not pass out of existence because it has become insolvent or has lost its property and ceased to carry on business. *Lucas v. Swan,* 67 F.2d 106 (4th Cir.1933). And finally, the mere transfer of corporate assets is not sufficient to work a dissolution. *E.g., Hunn v. United States,* 60 F.2d 430 (8th Cir.1932). Only a "total voluntary abandonment of its franchise [charter]" is sufficient to work a *de facto* dissolution. *Id.* at 432.

Contrary to Spurlock's contention, the evidence in this case indicates that Santa Fe Pacific has actively engaged in business from 1897 to the present. Letters, leases and other documents both from and to employees of Santa Fe Pacific evidence the ongoing business of Santa Fe Pacific in the 1940's and 1950's. Santa Fe Pacific offered into evidence minutes of several directors' and stockholders' meetings which reflect that the company was engaging in business. Similarly, the United States continued to recognize the existence of Santa Fe Pacific by issuing patents to it which are in evidence in this case.

Further, since 1904, Santa Fe Pacific has been involved in many litigated cases relating to its land grant holdings. Its existence has never been questioned in these suits. *See, e.g., United States v. Santa Fe Pac. R.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *Santa Fe Pac. R. Co. v. Work,* 267 U.S. 511, 45 S.Ct. 400, 69 L.Ed. 764 (1925); *Santa Fe Pac. R. Co. v. Cord,* 14 Ariz.App. 254, 482 P.2d 503, *cert. denied,*

404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971). In *New Mexico ex rel. Caledonian Coal Co. v. Baker*, 196 U.S. 432, 25 S.Ct. 375, 49 L.Ed. 540 (1905), the United States Supreme Court discussed the fact that Santa Fe Pacific had conveyed away its railroad property and was in the business of administering its land grants. Nothing in the opinion states that there was anything improper about this arrangement or that Santa Fe Pacific had ceased to be an existing corporation. Thus, we can see no factual basis for the trial court's ruling that Santa Fe Pacific has been dissolved *de facto*.

Finally, even if inactivity by Santa Fe Pacific could somehow constitute *de facto* dissolution, Spurlock would be estopped from denying the company's corporate existence. First, in each complaint, Spurlock alleged that Santa Fe Pacific is an existing corporation. One who sues a corporation as such or who has pleaded that an opposing party is a corporation, has elected to treat that party as a corporation and cannot deny its corporate existence. 8 Fletcher § 3944; *see also American Zinc Prods. Co. v. Sanders*, 175 Ark. 133, 142, 298 S.W. 857, 860 (1927).

Second, Spurlock and his predecessors have dealt with Santa Fe Pacific since the early 1940's as an existing corporation by entering into contracts and leases with Santa Fe Pacific, accepting deeds from Santa Fe Pacific and dealing with Santa Fe Pacific's lessees and accepting surface damages from them. Parties who contract with or otherwise deal with an entity as a corporation are estopped from denying the corporate existence of that entity in a subsequent lawsuit. *Exum Walker, M.D. P.C., Pension Trust v. Joanna M. Knox & Assocs. Inc.*, 132 Ga.App. 12, 13, 207 S.E.2d 570, 572 (1974); *see Associated Students v. Arizona Board of Regents*, 120 Ariz. 100, 103, 584 P.2d 564, 567 (App.1978).

### C. *Ultra Vires Acts*

The trial judge ruled that because Santa Fe Pacific was *de jure* or *de facto* dissolved, the conveyances to Spurlock's predecessors in title were *ultra vires*. But the trial court's holding is a non sequitur. An *ultra vires* act is one outside the corporation's power as found directly or impliedly in its articles of incorporation. *See Lurie v. Arizona Fertilizer & Chem. Co.*, 101 Ariz. 482, 421 P.2d 330 (1966). Thus, in order for a corporation to perform an *ultra vires* act it must necessarily exist. Having concluded that Santa Fe Pacific had been dissolved, it was logically impossible for the trial court to conclude that "therefore" its conveyances of the lawsuit lands were *ultra vires*.

In any event, Spurlock has no standing to raise a claim that the conveyances by Santa Fe Pacific were *ultra vires*. "[F]ederal corporations derive their existence and powers from acts of Congress, and ordinarily, proceedings to question the right of such corporations to exercise the corporate franchise or powers should be undertaken by the United States." 5 Fletcher § 2336. *See, e.g., First Nat'l Bank v. Missouri*, 263 U.S. 640, 660, 44 S.Ct. 213, 216, 68 L.Ed. 486, 494 (1924).

In summary, we conclude that (1) Congress has not dissolved Santa Fe Pacific; (2) Santa Fe Pacific is not *de facto* dissolved; and (3) Spurlock may not complaint that the conveyances of the lawsuit lands by Santa Fe Pacific were *ultra vires*.

## IV. ADVERSE POSSESSION AND RULE AGAINST PERPETUITIES

### A. *Adverse Possession*

Santa Fe Pacific contends, as an alternative basis for reversal, that it acquired title to certain of the minerals by adverse possession. In light of the holding in Section II., *supra*, we need not reach this contention. Spurlock argues, however, that regardless of how the mineral reservation is construed the judgments should be sustained because he acquired title to the mineral estate by adverse possession. We disagree.

After the surface estate has been severed from the underlying mineral

estate, title to the minerals cannot be acquired by adverse possession of the surface alone.[14] See *generally Annot.*, 35 A.L. R.2d 124, 154–55 (1954). Adverse possession requires an actual and visible appropriation of the mineral estate, commenced and continued under a claim of right inconsistent with and hostile to the claim of another. A.R.S. § 12–521(A). Where there has been a severance of the mineral and surface estate, such as in this case, "title by adverse possession can be acquired to the mineral rights, but all the essential elements of adverse possession must exist .... The exploration for minerals and mining operations ... must be open, notorious, continuous and hostile." *McCoy v. Lowrie*, 42 Wash.2d 24, 26–27, 253 P.2d 415, 417 (1953). See *Lehfeldt. v. Adams*, 130 Mont. 395, 303 P.2d 934 (1956). Mining for domestic purposes is insufficient to establish the requisite elements of adverse possession. *Mountain Mission School, Inc. v. Buchanan Realty Corp.*, 207 Va. 518, 151 S.E.2d 403 (1966). Similarly, the occasional taking of minerals, *White v. McNabb*, 140 Ky. 828, 131 S.W. 1021 (App. 1910), or taking from "time to time," *Central Trust Co. v. Harless*, 108 W.Va. 618, 152 S.E. 209 (1930), are likewise insufficient.

 Turning to the facts of this case, it is clear that as to the disputed minerals, Spurlock did not acquire title by adverse possession. First, with respect to helium, nitrogen and potash, Spurlock does not contend that he produced these minerals or gained title to them through adverse possession. Second, with respect to industrial clay and petrified wood, there is some evidence that Spurlock has taken these minerals off the land. This evidence shows, however, that the taking by Spurlock was intermittent and erratic and not of a sufficiently continuous nature to establish title by adverse possession.

**14.** Spurlock contends that because the deed conveyances of the lawsuit lands were void, his claim of title to the surface estate is predicated

### B. *Rule Against Perpetuities*

In light of our holding that title to the disputed substances lies with Santa Fe Pacific, it is also necessary to address the propriety of the trial court's ruling that Santa Fe Pacific's reserved right to use the surface to locate and remove minerals is in reality a repurchase option which violates the rule against perpetuities and the rule against unreasonable restraints on alienation. Each of the deeds conveying the lawsuit lands to Spurlock's predecessors provided that Santa Fe Pacific reserved the right:

[T]o use so much of the surface ... as shall be necessary and convenient for shafts, wells, tanks, pipe lines, rights of way, railroad tracks, storage purposes, and other and different structures and purposes necessary and convenient for the digging, drilling and working of any mines or wells which may be operated on said lands. Grantor, or its successors or assigns, will pay to Grantee, or the legal representatives, heirs, successors or assigns of Grantee, a fixed price per acre for the surface of all lands appropriated under this exception and reservation, which price shall be equal to the average price per acre paid for all the lands above described, together with the fair value of the buildings and permanent improvements, if any, on the land the surface of which is so appropriated. If the parties cannot agree upon such fair value it shall be fixed by three appraisers, of whom each party shall appoint one and the two so appointed shall appoint the third.

Little time need be spent in establishing that the foregoing does not violate the rule against perpetuities or any rule prohibiting unreasonable restraints on alienation.

 The reservation merely states what would otherwise be an implied right to reasonably use the surface in order to obtain "enjoyment" of the mineral estate. See *Keville v. Hollister Co.*, 29 Cal.App.3d 203, 105 Cal.Rptr. 238 (1972). In short, the

upon the doctrine of adverse possession. But this contention has been rejected. See Section III., *supra*.

reservation is simply not an option to re-purchase the fee title of the surface owner, as claimed by Spurlock, but rather merely a provision for compensation to the surface owner for the reserved right of use incidental to the mineral reservation.

## V. CONCLUSION

In conclusion, we hold that the mineral reservation is unambiguous and reflects the intent of the parties to completely sever the mineral estate from the surface estate. Thus, helium, nitrogen, potash, industrial clay and petrified wood are part of the mineral estate and have been reserved by Santa Fe Pacific.[15] With respect to sand and gravel, however, the trial court found that Santa Fe Pacific had abandoned its claim of ownership. Because Santa Fe Pacific has not disputed that ruling on appeal, the judgment granting title to the sand and gravel in Spurlock is affirmed.

We further hold that the trial court erred in ruling that the deed reservation was void in its entirety because Santa Fe Pacific was dissolved *de jure* or *de facto* or that the conveyances were *ultra vires*. Additionally, Spurlock has not acquired the mineral estate by adverse possession. Furthermore, Santa Fe Pacific's reserved right to use the surface for mining activities does not violate the rule against perpetuities nor does it constitute an unreasonable restraint on alienation.

Accordingly, we reverse the lower court's judgments quieting title to helium, nitrogen, potash, industrial clay and petrified wood in Spurlock. We reverse the judgments of conversion against Santa Fe Pacific and Kerr-McGee. We affirm the judgment quieting title in sand and rock to Spurlock. On remand, the trial court is directed to enter judgments quieting title

to helium, nitrogen, potash, industrial clay and petrified wood in Santa Fe Pacific.

HAIRE, P.J., and EUBANK, J., concur.

---

15. Santa Fe Pacific has filed a motion for an award of attorney's fees "incurred in that portion of the underlying action in the Superior Court relating" to its claim of title to the helium. Santa Fe Pacific's claim for fees is based upon A.R.S. § 12–1103(B). We need not decide

whether a prevailing defendant-counterclaimant in a quiet title action is entitled to fees because even if Santa Fe Pacific could establish its entitlement to fees, in the exercise of our discretion we would decline to award it fees.